WELLS, Appellant, vs. McGEOCH, Respondent.

*September 22, 1887 — March 27, 1888.*

*(1) Findings of fact: Insufficiency: Review on appeal.  (2–5) Illegal contracts: "Corners:" Accounting: Fraudulent representations: Recovery of overpayment in settlement of losses: Release fraudulently obtained: Reliance on partner's statements.*

1. A party need not indicate to the trial court in advance the specific facts upon which he desires findings, but may assume that the court will find upon all disputed questions. And it is sufficient to secure a review on appeal if due exception be taken that the findings fail to cover and include certain specified material questions of fact litigated on the trial.

2. The parties had made large profits out of a successful corner of the wheat market, and the plaintiff's share was left with the defendant and afterwards invested by him in a lard deal by direction of the plaintiff. *Held,* that the illegality of the wheat deal would not protect the defendant from accounting for the money.

Wells vs. McGeoch.

3. The parties were jointly interested in an unsuccessful attempt to corner the market for lard. In arranging between themselves for a settlement of their losses, the defendant overstated the amount invested by himself in the deal, and understated the amount invested by him for the plaintiff. Relying upon such statements the plaintiff paid more than his share in the settlement of the losses, and also gave the defendant a full release from all claims and demands on account of the deal. *Held:*

　(1) The statements by the defendant were fraudulent, whether he knew them to be untrue or made them in ignorance of the real facts.

　(2) Notwithstanding the illegality of the attempt to corner the market, the plaintiff may recover from the defendant such a sum as will reduce his payment to the amount he would have been required to pay on an accounting between the parties.

　(3) The release, fraudulently obtained, is no obstacle to such recovery.

4. The plaintiff had for a long time had joint transactions of great magnitude with the defendant, in whom he had unbounded confidence and to whom he had trusted their entire management. The business was done by defendant's firm in Chicago, but the accounts were sent to his Milwaukee house, and the plaintiff had free access to them. The plaintiff's share of the profits had been left with the defendant, and were afterwards invested by him in a lard deal by direction of the plaintiff. *Held,* that in arranging for a settlement of the losses by such deal the plaintiff had a right to rely upon the defendant's statement of the amounts invested therein by himself and for the plaintiff.

5. As a result of the unsuccessful deal in lard a firm in which the defendant was a partner failed. It was agreed between the parties that the capital stock of such firm was not to be considered a debt of the firm which the parties were to assume or endeavor to pay. *Held,* that such agreement affected only such capital as remained a liability of the firm, and in an accounting between the parties of their respective investments in the deal the defendant was entitled to be allowed his capital which he had drawn out of the firm and invested in the deal.

APPEAL from the County Court of *Milwaukee* County. The action is to recover a large sum of money which the plaintiff, *Daniel Wells, Jr.,* alleges he was induced to pay by means of certain false and fraudulent representations

made to him by the defendant, *Peter McGeoch*, concerning certain large business transactions in which they had been engaged as partners, and which had culminated in heavy losses to them. The complaint sets out such alleged fraudulent statements at considerable length, and prays that a certain settlement and adjustment of their losses between themselves, alleged to have been made and performed by *Wells* on the faith of such statements, be opened, and the amount of the common loss which each party ought to pay ascertained and adjusted. The answer denies the fraud charged in the complaint, and maintains that the settlement was an honest one and should not be disturbed. It is also alleged in the answer that the transactions had by the parties as partners, which they thus settled and adjusted, were illegal, and hence, in respect to them, neither party can have any relief.

A general knowledge of the transactions out of which this action arose can be most readily obtained by a perusal of the findings of the county court herein, and the contract executed by the parties in which they settled and adjusted their respective losses and provided for the payment thereof. Although quite lengthy, those instruments will be here inserted. The findings of fact are supplemented by other facts not found therein, which are stated in the opinion as found by this court. The findings are as follows:

"The defendant, several years prior to June 16th, 1883, was engaged in business in the city of Milwaukee under the name of Peter McGeoch & Co., as a commission merchant, in commodities dealt in upon the floor of the chamber of commerce of this city. In 1881, down to June 16, 1883, he was the leading partner in the firm of McGeoch, Everingham & Co., doing like business on the board of trade of Chicago. During those years the defendant, through his Chicago firm, had extensive dealings upon the Chicago board of trade in various commodities, chiefly in

futures, on account of himself and the plaintiff jointly. Such dealings began in January, 1881, and continued until about the middle of February, 1882, when a settlement was had, and on the 23d day of that month the plaintiff received from the defendant full payment of the balance then appearing to be due him for his share of the profits. The total net profits up to February 23, 1882, received by the plaintiff, was a little more than $300,000, including the half share ($278,161.41) of the profits of an extensive deal in pork and ribs. About February 20, 1882, the plaintiff became associated with the defendant and others in a wheat speculation in Chicago, known as the April wheat deal, or corner in April wheat, 1882. The defendant, with George C. Walker, N. K. Fairbank, and S. A. Kent, of Chicago, Illinois, commission merchants and members of the board of trade of that city, though not associated in business generally, in February, 1882, bought, and soon took out of the market, all the No. 2 spring wheat within reach and available to fill contracts for about 3,500,000 bushels, and secured contracts from dealers for the sale and delivery to them in April, 1882, of about 10,000,000 bushels more; and having thus obtained control of the market, compelled those who had contracted to deliver them wheat which they could not get, to settle their contracts by the payment of differences upon fictitious values. The defendant was actively engaged in the management and manipulation of the corner, and the plaintiff advanced moneys to be used in carrying it on, upon the agreement that they should divide equally as partners; the share of the defendant, as member of the combination associated in the deal, being one third. The combination entered into the arrangement with the express purpose of creating a corner in wheat in the market, and the plaintiff well knew such to be the intention when he entered into said agreement with the defendant and furnished him money to assist in accomplishing that

end; and the result shows that the combination was entirely successful. The corner ended with the month of April, 1882. An arbitration, under the rules of the board of trade, to fix the just commercial value of the wheat on the last day of April in Chicago, as the basis of difference to be paid by certain defaulting sellers to members of the combination, was had. The accounts of the deal were closed June 30, 1882. The defendant's one-third share of the net profits was ascertained to be $278,705.57, which sum was passed to his credit on the books of McGeoch, Everingham & Co., in Chicago, on that day. The largest proportion of this profit had been realized by a settlement of differences before the rule authorizing arbitration had been invoked by any of the persons involved in the said corner.

"No account was kept with the plaintiff on the books of the Chicago firms. The plaintiff's account was kept on the books of P. McGeoch & Co., in Milwaukee, and it was the practice that the dealings of the plaintiff and defendant on joint account through McGeoch, Everingham & Co., were reported to P. McGeoch & Co. (the defendant), and the plaintiff's share was entered on his account in the books of that commission house in Milwaukee. The plaintiff's share of the profits of the April wheat corner was not credited on his account in Milwaukee at the time the profits were ascertained, but the whole profit realized in the wheat deal was credited to XX account on the books in Milwaukee,— both parties knowing that XX represented the wheat deal,— owing to some pending suit which might affect the amount; and the fact that it was not so credited seems to have been afterwards overlooked or forgotten,— not with a view of concealing the same from the plaintiff, for he had oftentimes been informed that a large profit resulted from the corner and that XX represented such profit. Following this corner, the plaintiff and defendant continued speculative dealings for their joint account through the agency

·of McGeoch, Everingham & Co., in wheat, oats, pork, lard, and other commodities; making profits and losses, which they shared equally. Their profits were quite large during September and October, 1882. They had operated together several years, and both were well acquainted with the manner of doing business upon the chamber of commerce in Milwaukee and the board of trade in Chicago, and well knew how to operate successfully. Early in 1883, the plaintiff and defendant agreed to make a deal in lard in Chicago, and commenced buying (through defendant's firm in Chicago) futures for April, May, and June, and afterwards for July, 1883. As their purchases matured, they received and paid for the lard, and continued to contract for all they could get, within certain limits as to price, for future delivery, until June 16th, when they found themselves unable to provide money sufficient to keep up payments for lard then due upon their contracts, and margins upon their futures; and, as a consequence, the firm of McGeoch, Everingham & Co. failed. In pursuance of the rules of the board of trade, their pending contracts for purchase or sale were closed out. The price of both cash lard and option lard (so called) fell at once fifteen to twenty per cent.; and the firm who had represented the plaintiff and defendant in operating the deal for them, and under their direction, found themselves insolvent, having lost their capital, their earnings, and all the moneys furnished by the plaintiff and defendant and by other principals as advances upon deals which the firm were carrying for them as their agents or brokers. At the time of the failure, McGeoch, Everingham & Co. held for the parties to this suit about 125,000 tierces of cash lard, which had cost some $5,100,000; and of this amount 119,500 tierces were hypothecated to sundry banks in Chicago to secure loans to the firm, amounting to about $3,981,000. Said firm at the same time had contracted to purchase for account of the plaintiff and defend-

ant about 177,000 tierces of lard to be delivered in June and July, 1883, aggregating not less than $7,000,000; on which contracts they had put up several hundred thousand dollars as margins to secure their performance.'

" The plaintiff and defendant had furnished to said firm, for the purpose of the deal during its progress, the proceeds of their notes to the amount of $950,000, which were used in paying for lard, in providing margins on the futures, and in paying interest, insurance, and other expenses of the deal. The balances due from said firm to the defendant and to others, and the capital and accumulated earnings of the firm, were to a great extent invested and employed in paying for the property and contracts taken for the parties to this suit in the working of their said lard deal.

. " The firm had some commission for other parties, but much the larger part of their losses by their failure were incurred on lard, and for the account of *Wells* and *McGeoch.* The failure involved many houses and heavy losses. Values were greatly disturbed, both of lard and other commodities. The indebtedness of McGeoch, Everingham & Co. was to a great number of persons. Their transactions were extensive, and the accurate adjustment of all accounts was laborious. The lard held and pledged by banks was not sold until several weeks after the failure of McGeoch, Everingham & Co., which occurred on Saturday, June 16, 1883. On Monday, June 18th, John R. Bensley was appointed receiver of the assets of the firm, in a suit by judgment creditors. He set about ascertaining losses and liabilities. Creditors brought actions against *Wells* and *McGeoch* as principals, and attached their property in Chicago, Milwaukee, and Michigan. It was soon claimed that the creditors of the Chicago firm would accept fifty cents of the amount due them, if paid shortly in cash. The receiver visited Milwaukee before the end of June, and conferred with the defendant and his attorney, and with the plaintiff's attorney. He

stated that in his judgment $450,000, in addition to the available assets in his hands, would be required, and would be adequate to effect a settlement at fifty cents on the dollar.

"I further find that the plaintiff authorized the use for the purposes of said deal of the moneys due him from *McGeoch*, or in the hands of McGeoch, Everingham & Co., and derived from or arising out of former transactions in which plaintiff was interested; and under such authority, and with the consent of plaintiff, the $100,455.39 was so used in the lard deal, and also the plaintiff's share of the profits of the wheat corner of 1882, and represented in the XX account, was so used, and both sums were wholly lost in said deal.

"I further find that it clearly appears to me from the evidence, and from the manner in which, and the objects for which, the lard deal was inaugurated and carried on, that it was for the purpose of creating a corner in lard, and so understood by both parties, with the intention of cornering the market by investing large sums in the purchase of lard, and for futures for the months of June and July, and the scheme failed solely for want of funds to carry it through; and an indebtedness remained unpaid amounting to upwards of $1,300,000, as a result of the failure of said parties to sustain or consummate the corner enterprise. Of this indebtedness about $1,000,000 was owing on account of transactions made by the firm for *Wells* and *McGeoch* in the furtherance of their lard corner.

"I further find that prior to July 4, 1883, it was verbally agreed between the parties that they would each furnish one half of $450,000 to enable McGeoch, Everingham & Co. to compromise and settle their liabilities resulting from their inability to corner the market in lard; and that *McGeoch* should assume the payment of $25,000 to the Wisconsin Marine & Fire Ins. Co. Bank for *Wells*. Early in

July a compromise proposition at fifty per cent. was circulated in Chicago among the creditors, and by the middle of July it was accepted by all. Disagreements arose between the parties when it came to making of a contract between them. It was understood that the liabilities of the firm of McGeoch, Everingham & Co. on the board of trade were about $1,300,000 over and above all offsets; that the assets of the firm in the hands of the receiver were a little over $200,000, and that the whole indebtedness could be compromised for about $650,000. The plaintiff insisted that, if he paid the sum of $225,000, he should be fully released from all liabilities to McGeoch, Everingham & Co., or any of their creditors, or to *McGeoch*, and should be fully indemnified against any claims, costs, or damages growing out of the lard deal; and he sought, in addition thereto, to reserve the right to have a subsequent accounting with McGeoch, Everingham & Co., and with *McGeoch*, in respect to the whole business of the lard deal. The defendant insisted that the release should be mutual, and the settlement final and absolute. And for the purpose of compromising their supposed liability, incurred on their failure to successfully corner the market in lard or in their attempt to do so, an agreement to be executed by the parties was prepared, and after delay and discussion, resulting in important modifications of the original draught so as to make it express clearly the intentions of the parties, was signed by them on or about July 18th, in form and substance as set forth in the complaint."

Several extracts from such contract or agreement are then inserted in the findings, but, as that instrument will be copied herein at length, those extracts therefrom are now omitted. The findings proceed as follows:

"By the agreement, *Wells* agreed to assume and pay $675,000, and *McGeoch* $275,000, of their notes to the banks, and each of them agreed to pay forthwith the sum of

$225,000 towards the liquidation and discharge of the said indebtedness of McGeoch, Everingham & Co. under said compromise, and particularly of the indebtedness on which it was claimed that *Wells* was liable, and to the execution of the compromise agreement; and both parties intrusted the making of the payment of such indebtedness to the firm of Finches, Lynde & Miller and John R. Bensley, the receiver.

"I further find that *McGeoch* fully performed the agreement on his part. He furnished $225,000 at once to assist in effecting the compromise. The indebtedness was all discharged; the suits were all discontinued without expense to the plaintiff; and plaintiff has hitherto been fully indemnified against all claims and demands of McGeoch, Everingham & Co., or their creditors, or any one else, arising out of said lard transaction. I further find that from the time of the failure of McGeoch, Everingham & Co., June 16, 1883, up to the time of the execution of the compromise agreement, on July 17, 1883, the parties were under great excitement on account of the failure, the property and credits of each having been attached and garnished; and, while in this condition and situation, several interviews were had between the parties and their several attorneys, and various estimates were made as to the extent of the loss; and it could not be expected that accurate statements of so large a transaction could be made by either of the parties. The business was done through the firm of McGeoch, Everingham & Co., in Chicago, and, although *McGeoch* was the senior member of that firm, yet his business was on the board of trade; the firm employing book-keepers to assist in keeping a record of the various transactions on the board of trade and otherwise. *McGeoch* was no book-keeper, and had no knowledge of the books. Statements were delivered to him as he asked for them, and they were usually

sent to *McGeoch's* book-keeper in Milwaukee, who kept an
entry of such statements. The plaintiff had free access to
those books, both in Milwaukee and Chicago, and almost
daily visited the office in Milwaukee, and was informed by
the book-keeper in Milwaukee of the transactions in lard
many times; as also by *McGeoch*, personally and by letter,
during the lard deal and until the failure; so that the plaint-
iff probably had nearly, if not quite, as accurate a knowl-
edge of the lard deal as defendant. And what was said by
defendant during the negotiations for a compromise was
not said with a view of cheating and defrauding the plaint-
iff, but was only an estimate of the probable losses and lia-
bilities, and not relied on by plaintiff; for the settlement
was finally consummated upon the estimate made by Mr.
Bensley, the receiver, who had found from the books as ac-
curate a statement as possible, for everything had to be
done in haste, as to the amount of the liabilities, and the
money necessary to be furnished by each.

"I further find that the moneys furnished by plaintiff and
delivered to defendant, together with the amount due him
on the April wheat corner, and also the amount specified in
the agreement of July 17th, together with the money fur-
nished by defendant individually and through his firm in
Chicago, was all paid and lost. The moneys paid to the
receiver were by him applied on the settlement with the
creditors, and not one penny of it was retained by the de-
fendant, or repaid to him or for his use or benefit; and he
had no money in his hands, possession, or control furnished
by the plaintiff; and, as before found, the amount specified
in the agreement of July 17th, and the credit of plaintiff
resulting from the April wheat corner, was, with the knowl-
edge and consent of plaintiff, used and paid by defendant
towards the furtherance of the lard corner, and all lost
through the failure of McGeoch, Everingham & Co., result-

ing from the failure of plaintiff and defendant to furnish the money necessary to carry on the lard deal to a successful corner.

"I also find that at the time the several transactions upon the board of trade in the city of Chicago, Ill., took place between plaintiff and defendant, the following statute, offered and received in evidence, was in force, to wit: The Public Statutes of the State of Illinois, Heard's edition of 1880, sec. 130, ch. 38 of the Revised Statutes of Illinois, and reads as follows: 'Whoever contracts to have, or to give to himself or another, an option to sell or buy at a future time any grain or other commodity, stock of any railroad or other company, or gold, or forestalls the market by spreading false rumors to influence the price of commodities therein, or corners the market, or attempts to do so, in relation to any such commodities, shall be fined not less than ten dollars nor more than $1,000, or confined in the county jail not to exceed one year, or both; and all contracts made in violation of this section shall be considered gambling contracts, and shall be void.' It seems to me beyond any doubt, from all the evidence, that the parties to this suit, in their combination and management of the April wheat deal and securing and obtaining a successful corner in wheat, clearly violated the provisions of the foregoing statute; and also, in attempting to corner the market in lard, they violated the same statute. Such contracts, as stated in such statute, 'shall be considered gambling contracts, and shall be void.'

"As a result arising from the failure to successfully create a corner in lard, the contract agreement of July 17, 1883, was entered into by the parties to relieve themselves from their great liability resulting from the failure to carry their illegal deal to a successful corner, and the numerous suits, attachments, and garnishments commenced and pending against them.

"The object of this action is to compel the defendant to account, or, in other words, to surcharge the account, as prayed for in the complaint, for the excess of moneys claimed by plaintiff to have been furnished by him over and above the amount furnished by defendant, and employed and lost in the prosecution of this illegal venture, this effort to corner the market in lard. The question is, the parties having violated the statute above mentioned, will the courts entertain an action asking contribution for losses incurred by the one party against the other, or for excess of moneys paid in carrying out the illegal venture or contract? And as conclusions of law from the foregoing facts, I find it quite doubtful in my mind, taking into consideration the testimony of all the circumstances leading to and surrounding it, whether this contract ought to be disturbed, even if the original ventures entered into by the parties, and upon which it is founded and based, were not illegal, or against the statute, òr contrary to public policy. The rule in this state is, as often stated by the court in the language of the court in *Case v. Fish*, 58 Wis. 108, 'that a settlement once deliberately made is not to be opened except upon the clearest and most positive proof of fraud or mistake therein.' And especially is this so when the same has been fully complied with and carried out, but the contracts were contrary to the statute and illegal and void.

"2. The supreme court of this state has also declared in *Melchoir v. McCarty*, 31 Wis. 254, in the following language: 'The general rule of law is that all contracts which are repugnant to justice, or founded upon an immoral consideration, or which are against the general policy of the common law, or contrary to the provisions of any statute, are void; and that if a party, claiming a right to recover a debt, is obliged to trace his title or right to the debt through any such illegal contract, he cannot recover, because he cannot be allowed to prove the illegal contract as the foundation

for his right of recovery. It is quite immaterial whether such illegal contract be *malum in se,* or only *malum prohibitum.* In either case the maxim *ex turpi causa non oritur actio* is applicable. And a contract in violation of a statute is void, although the statute fails to provide expressly that contracts made in violation of its provisions shall not be valid. It is sufficient that it is prohibited, and its invalidity follows as a legal consequence.'

"So, also, it is decided by the supreme court of Michigan, in the case of *Raymond v. Leavitt,* 46 Mich. 447, that one who lends or advances money to be used for the purpose of making a corner in wheat, cannot recover it back by any legal measures; and on pages 452 and 453 of the opinion the court used this language: 'There may be difficulties in determining the conduct as to any violation of public policy, when it has not been covered by the statutes or precedents. But in the case before us the conduct of the parties comes within the undisputed censure of the law of the land; and we cannot save the transaction without doing so on the ground that such dealings are so manifestly sanctioned by usage and public approval that it would be absurd to suppose the legislature, if attention were called to them, would not legalize them. We do not think public opinion has become so thoroughly demoralized; and until the law is changed we shall decline enforcing such contracts. If parties see fit to invest money in such ventures, they must get it back by some other than legal means.' It would seem, from the foregoing opinion, that there was no statute in Michigan making such contracts illegal and void; and hence, it appears to me, is a very strong case, and very applicable to this case, in respect to the ventures of the parties to this suit in the so-called April wheat corner and so-called lard corner.

"I have also been referred to the case of *Keene v. Kent,* decided at a general term of the supreme court of the state

of New York, at the October term of said court, 1886 [42 Hun, 659], which also was a case involving lard. In that case the parties, as in this, entered into an unlawful contract or combination to control the price of lard, and in the opinion the court say: 'This was an agreement and combination which the law will not execute. It will not permit parties receiving property, and contemplating the purchase and sale of more of it, to combine together to keep it off the market, and in that manner oblige the public to pay a larger price for the article than it would otherwise secure. Such a combination is an unlawful conspiracy, punishable as a crime. When it may be successfully carried out, the effect is to impose upon the public, and to oblige individuals having occasion to purchase the article dealt in to pay more for it than its market value. So far as such a combination or scheme may be rendered successful, it is little if anything less than respectable robbery, which the law will not sustain. On the contrary, it will leave the parties precisely where they have placed themselves. It will not interpose to secure to either that advantage which, under the terms of the agreement entered into and executed, he had reason to expect would be conceded to him by the other parties to the unlawful transaction. If persons devise and enter into schemes or combinations of this character, they must depend for their remedy upon the application of the rule, which may be observed by other confederates, requiring that there shall be honor among certain classes of persons who violate the laws of the state. They cannot appeal to the courts for redress, or for any aid or assistance in endeavoring to enforce the contract, so far as may be, in favor of one of the parties against the other.'

" 3. The contracts or combinations of the parties entered into for the purpose of cornering the market in wheat, and attempt to create the corner in lard, are by the statutes of Illinois denominated gambling contracts, and declared to be

void. Such contracts the courts will not enforce, but will leave the parties in the condition in which they have placed themselves. The authorities are all to this effect.

"4. I therefore have come to the conclusion, from the foregoing facts found and the law applicable to them, that the court cannot grant the plaintiff the relief prayed for in his complaint. It is therefore ordered and adjudged that the complaint of the plaintiff be, and the same is, dismissed, with costs. Let judgment be entered accordingly."

The contract above mentioned bears date July 17, 1883, and is as follows:

" Whereas, the firm of McGeoch, Everingham & Co. are indebted to a number of creditors in large sums of money, which indebtedness they have arranged to discharge and settle by a compromise proposition which has been accepted by their creditors; and whereas, it has been claimed that *Daniel Wells, Jr.*, of the city of Milwaukee, Wisconsin, and *Peter McGeoch*, of the same place, are liable upon some ground to pay, or to assist in paying, the whole or some part of such indebtedness on account of transactions which the said *Wells* and *McGeoch* have had or authorized with or through the said firm, of which the said *Peter McGeoch* is senior member; and whereas, the said *Wells* and *McGeoch* have agreed to contribute and pay a sum of money for the purpose of assisting in the compromise, payment, discharge, and satisfaction of all the indebtedness of the said firm, and of their own indebtedness, if any, to said firm, or to the creditors of said firm, and also of their mutual indebtedness towards each other; and whereas, the said *Wells* and *McGeoch* have executed certain notes as makers, or as maker and indorser, to certain banks, for money raised for the benefit of the said *Wells* and *McGeoch*, or of one of them, which notes are to be paid in full, being secured by hypothecation of property pledged, deposited, or mortgaged by the said *Wells* or the said *McGeoch:*

"Now, therefore, for the purpose of a full, final, and complete settlement between the said parties, it is agreed between the said *Daniel Wells, Jr.*, and the said *Peter McGeoch*, that the said *Daniel Wells, Jr.*, shall pay to the National Bank of America, in Chicago, the notes, amounting to $100,000, held by the said bank and signed or indorsed by the said *Wells* and *McGeoch;* and that he shall also pay the note or notes for $100,000 held by the National Exchange Bank of Milwaukee, and the note or notes, amounting to $200,000, held by the First National Bank of Milwaukee, and the note or notes, amounting to $50,000, held by the Milwaukee National Bank of Wisconsin, whether such notes be also signed or indorsed by the said *Peter McGeoch* or not; and that the said *Wells* shall pay to the Wisconsin Marine and Fire Insurance Company Bank the note of $200,000 on which said *Wells* and *McGeoch* are liable to the said bank, and also $25,000 of and to apply upon the note of $300,000 held by the said bank on which the said *Wells* and *McGeoch* are liable, together with all interest accruing on the said notes and the said sums from and after the date hereof. And the said *Wells* shall procure, as soon as practicable, the release of said *Peter McGeoch* from each and all of the said indebtedness which the said *Wells* has so agreed to pay; and also, as soon as practicable, the release and discharge of all liens, mortgages, pledges, or hypothecations of property of the said *Peter McGeoch*, holden as collateral for the indebtedness so to be paid by the said *Daniel Wells, Jr.*

And whereas, there is a balance shown by the books of said McGeoch, Everingham & Co. in favor of the said *Daniel Wells, Jr.*, amounting to $100,455.39, as stated by that firm to said *Daniel Wells, Jr.*, the said *Wells* hereby releases and discharges the said *McGeoch* and the said McGeoch, Everingham & Co. from the said indebtedness, and from all liability to pay him the said sum of $100,455.39, or

any part thereof, and from any and all liability whatever except as herein provided. The said *Daniel Wells, Jr.,* further agrees to pay towards the liquidation and discharge of the said indebtedness the sum of $225,000, which amount he will pay, or cause to be paid, to the firm of Finches, Lynde & Miller, of the city of Milwaukee, immediately upon the execution of this agreement, for the purpose only of paying towards the liquidation and compromise of the indebtedness aforesaid, and particularly of the indebtedness upon which it is claimed that the said *Wells* is liable.

" And the said *Peter McGeoch,* on his part, agrees, in consideration of the foregoing, that he will pay to the said Wisconsin Marine and Fire Insurance Company Bank the remaining $275,000 out of the said note of $300,000 owing thereto by him and the said *Daniel Wells, Jr.,* together with all interest accruing thereon from and after this date; and that he will pay, or cause to be paid, forthwith, all indebtedness of the said *Wells* to the said McGeoch, Everingham & Co., and to any and all of the creditors of the said McGeoch, Everingham & Co., by executing promptly and faithfully the terms of the compromise made between the. the said McGeoch, Everingham & Co. and their said creditors; and will procure the full and unconditional discharge of all liabilities, claims, and demands of the said McGeoch, Everingham & Co., and of each of the creditors, or persons holding contracts of the said McGeoch, Everingham & Co., against him, the said *Daniel Wells, Jr.,* whether included or not in the said compromise, within the time fixed by said agreement of compromise, to wit, ten days from Saturday last, or as soon thereafter as practicable; and that he will procure, also, as soon as practicable, the discharge of the liability of the said *Daniel Wells, Jr.,* to the said Wisconsin Marine and Fire Insurance Co. Bank for said $275,000; and also, as soon as practicable, the release and discharge of all mortgages, liens, pledges, or hypothecations of property of

the said *Daniel Wells, Jr.*, held by the said last-named bank as collateral to the said indebtedness of $275,000. And the said *Peter McGeoch* hereby releases and discharges the said *Daniel Wells, Jr.*, of and from all claims, liabilities, and demands whatever heretofore existing, except those herein agreed to be paid by the said *Wells;* and further agrees that the money so contributed by the said *Daniel Wells, Jr.*, and to be paid to the said firm of Finches, Lynde & Miller, together with an equal or greater sum which he agrees forthwith to contribute for that purpose, and together with the money now in possession of the receiver of the estate of the said firm of McGeoch, Everingham & Co., shall be forthwith applied to the payment and discharge of the indebtedness which the said *McGeoch* is by this agreement bound to cause to be paid or discharged, and particularly to the execution of the compromise agreement aforesaid between the said firm and their creditors; the making of which payment is intrusted by both parties hereto to the said firm of Finches, Lynde & Miller and John R. Bensley.

"It is understood that, by the said agreement of compromise, the creditors have agreed to receive, in full discharge of the said unsecured indebtedness, fifty cents upon the dollar, or one half the amount thereof. It is also understood that the said agreement of compromise does not include the debts owing by the said firm which are secured by the pledge of property or otherwise to the extent of the proceeds of such property, but does include the balances or remainders which may be found due to the said creditors after applying upon their respective indebtedness the amounts of securities so deposited with or pledged to them.

" This agreement is made in full settlement and discharge of all liabilities between the parties hereto; and the said *McGeoch* agrees to hold the said *Wells* harmless, and to

indemnify him against all losses, damages, expenses, costs of suits, of whatever nature, which may arise hereafter out of any failure upon the part of said *McGeoch* to perform the stipulations herein contained, and also against all such costs or expenses which have arisen in the suits now pending against the said *Wells* on account of the matters aforesaid, whether as principal or garnishee, except as to counsel fees owing by the said *Wells*, which he undertakes to pay and discharge; which pending suits said *McGeoch* shall cause to be discontinued as soon as practicable."

The terms of the above contract were fully performed by the respective parties. The case is further stated in the opinion. The plaintiff appeals from a judgment dismissing the complaint with costs.

For the appellant there were briefs by *Winfield Smith* and *Wells, Brigham & Upham*, attorneys, and *Winfield Smith* and *Jenkins, Winkler, Fish & Smith*, of counsel, and the cause was argued orally by *Winfield Smith, John T. Fish*, and *F. C. Winkler*. They argued that the *gravamen* of the action is the fraud practiced by the defendant in obtaining from the plaintiff the money assumed and paid on and after July 17, 1883, by reason of the false representations of the defendant as to the amount which the plaintiff should pay to make his contribution equal to that of the defendant. The action is not upon any contract to buy lard or wheat upon the Chicago market. These contracts are set out in the complaint to show the means employed by the defendant in perpetrating the fraud. *Kiewert v. Rindskopf*, 46 Wis. 484; *Western Ass. Co. v. Towle*, 65 id. 258; *Catts v. Phalen*, 2 How. 376. The defendant cannot refuse to account for the plaintiff's share of the profits of the wheat deal, which was left in his hands, on the ground that that transaction was illegal. *Kiewert v. Rindskopf*, 46 Wis. 485; *Heckman v. Swartz*, 50 id. 270; *Lemon v. Grosskopf*, 22 id. 451; *Tenant v. Elliott*, 1 Bos. & P. 4; *Farmer v.*

*Russell,* id. 296; *Bousfield v. Wilson,* 16 Mees. & W. 185; *Owen v. Davis,* 1 Bailey (S. C.), 316; *Gilliam v. Brown,* 43 Miss. 641; *Anderson v. Moncrieff,* 3 Desaus. (S. C.), 126; *Sharp v. Taylor,* 2 Phill. (22 Eng. Ch.), 801; *McBlair v. Gibbes,* 17 How. 232, 237; *Brooks v. Martin,* 2 Wall. 70; *Planters' Bank v. Union Bank,* 16 id. 483; *Wann v. Kelly,* 5 Fed. Rep. 584; *Cook v. Sherman,* 20 id. 167; *Merritt v. Millard,* 5 Bosw. 645; *S. C.* 4 Keyes, 208; *Berkshire v. Evans,* 4 Leigh, 223; *Blakesley v. Johnson,* 13 Wis. 530; *Clemens v. Clemens,* 28 id. 637. If the defendant had occupied no other relation to the plaintiff than that of agent, he could have been convicted of embezzlement for appropriating this money to his own use. *Woodward v. State,* 103 Ind. 127; *U. S. Exp. Co. v. Lucas,* 36 Ind. 361; *Rothrock v. Perkinson,* 61 id. 39; *State v. Tumey,* 81 id. 559; *Carkins v. Anderson,* 21 Neb. 364; *Bell v. Day,* 32 N. Y. 165, 173.

The following cases, as well as many of those above cited, show clearly the distinction drawn by the courts. They point out that while the vendor of wheat or lard may set up the illegality of the contract of sale, yet when he has closed that contract, paying damages for nonfulfilment, that contract is at an end. The proceeds are then in the hands of the recipient lawful money untainted by the preceding transaction, and he must account for it to his principal or partner. *Bronson A. & B. Asso. v. Ramsdell,* 24 Mich. 441; *Willson v. Owen,* 30 id. 474; *Ingram v. Mitchell,* 30 Ga. 547; *Warren v. Hewitt,* 45 id. 507; *Daniels v. Barney,* 22 Ind. 207; *Barney v. Daniels,* 32 id. 19; *Murray v. Vanderbilt,* 39 Barb. 141; *De Leon v. Trevino,* 49 Tex. 89; *Pfeuffer v. Maltby,* 54 id. 454; *Lewis v. Alexander,* 51 id. 578, 590.

Counsel for the appellant also argued, among other things, that both as the agent and partner of the plaintiff the defendant was bound to exercise the utmost good faith and

to keep the plaintiff fully informed of all material facts; that the plaintiff's misunderstanding of facts, considered as a mere mistake, is yet sufficient ground for relief; and that the case clearly shows both misrepresentation and concealment by the defendant of facts material to the plaintiff's interest, which he should have disclosed to the plaintiff, but failed to do so with the purpose of gaining an undue advantage.

For the respondent there were briefs by *Joshua Stark* and *Finches, Lynde & Miller*, and oral argument by *Mr. Stark* and *Mr. Geo. P. Miller*. They contended, *inter alia*, that the combination for cornering the market in relation to wheat in the spring of 1882, was an unlawful conspiracy punishable as a crime. 1 Rapalje & L. Law Dict. 296; *Sampson v. Shaw*, 101 Mass. 145, 3 Am. Rep. 327; 14 Chicago L. News, 37; R. S. of Ill. (1880), p. 38, sec. 130; *Lyon v. Culbertson*, 83 Ill. 33, 25 Am. Rep. 349; *Raymond v. Leavitt*, 46 Mich. 447, 41 Am. Rep. 170; *Morris Run Coal Co. v. Barclay Coal Co.* 68 Pa. St. 173, 8 Am. Rep. 159; *Arnot v. P. & E. Coal Co.* 68 N. Y. 558, 23 Am. Rep. 190; *Ex parte Young*, 6 Biss. 53, 65; Wharton's Cr. Law, sec. 2322; *Comm. v. Carlisle*, Brightly, 40; *People v. Fisher*, 14 Wend. 9, 28 Am. Dec. 501; R. S. sec. 4568; 1 Lindley on Part. 180-192.

The agreement or conspiracy of *Wells, McGeoch*, and others to corner the market in relation to wheat and divide the profits among them being illegal, fraudulent, and void, it follows that no action can be maintained by any party to such conspiracy against his associates, or either of them, to enforce an accounting, contribution, or division of profits, or for any other relief founded upon such agreement. *Mitchell v. Cockburne*, 2 H. Blackst. 379; *Steers v. Lashley*, 6 Term, 61; *Aubert v. Maze*, 2 Bos. & P. 371; *Knowles v. Haughton*, 11 Ves. Jr. 168; *Cousins v. Smith*, 13 id. 542; *Ex parte Bulmer*, id. 313; *Evans v. Richardson*, 3 Meriv. 469;

*Battersby v. Smyth*, 3 Madd. 110; *Armstrong v. Armstrong*, 3 Mylne & K. 45; *Ewing v. Osbaldiston*, 2 Mylne & C. 53; *Sykes v. Beadon*, L. R. 11 Ch. Div. 170; *Bartle v. Nutt*, 4 Pet. 184; *Wheeler v. Sage*, 1 Wall. 518; *Brown v. Tarkington*, 3 id. 377; *Fletcher v. Watson*, 7 Gratt. 1; *Watson v. Murray*, 23 N. J. Eq. 257; *Gregory v. Wilson*, 36 N. J. Law, 315; *Todd v. Rafferty's Adm'rs*, 30 N. J. Eq. 254; *Root v. Stevenson's Adm'r*, 24 Ind. 115; *Miller v. Davidson*, 8 Ill. 518, 44 Am. Dec. 715; *Skeels v. Phillips*, 54 Ill. 309; *Neustadt v. Hall*, 58 id. 172; *Craft v. McConoughy*, 79 id. 346, 22 Am. Rep. 171; *Lane v. Thomas*, 37 Tex. 157; *Read v. Smith*, 60 id. 379; *Mulhollan v. Voorhies*, 3 Martin (N. S.), 46; *Anderson v. Powell*, 44 Iowa, 20; *Boyd v. Barclay*, 1 Ala. 34, 34 Am. Dec. 762; *Belding v. Pitkin*, 2 Caines R. 147; *Hooker v. Vandewater*, 4 Denio, 349; *Stanton v. Allen*, 5 id. 434; *Atcheson v. Mallon*, 43 N. Y. 147; *Gray v. Hook*, 4 id. 449; *Woodworth v. Bennett*, 43 id. 273; *Arnot v. P. & E. Coal Co.* 68 id. 558, 23 Am. Rep. 190; *Sampson v. Shaw*, 101 Mass. 145, 3 Am. Rep. 327; *Snell v. Dwight*, 120 Mass. 9; *Dunham v. Presby*, id. 285; *Morris Run Coal Co. v. Barclay Coal Co.* 68 Pa. St. 173, 8 Am. Rep. 159; *King v. Winants*, 71 N. C. 469, 17 Am. Rep. 11; *Gould v. Kendall*, 15 Neb. 549; *Hardy v. Stonebraker*, 31 Wis. 640; *Fairbank v. Leary*, 40 id. 637.

There are many well considered cases holding that even in transactions between a principal and his agent or broker, in illegal grain, stock, or other speculations, notes given for losses, advances, or profits are void because of their connection with the illegal adventure. See cases above cited, also *Brown v. Turner*, 7 Term, 630; *Harley v. Stapleton's Adm'r*, 24 Mo. 248; *Whitesides v. Hunt*, 97 Ind. 191, 49 Am. Rep. 441; *Cunningham v. Nat. Bank*, 71 Ga. 400; 51 Am. Rep. 266; *Collins v. Nevin*, 27 Alb. L. J. 354; *Fareira v. Gabell*, 89 Pa. St. 89; *Bell v. Quinn*, 2 Sandf. 146; *Workingmen's B. Co. v. Rautenberg*, 103 Ill. 460; *In re Green*, 7 Biss. 338;

*Barnard v. Backhaus*, 52 Wis. 593; *Everingham v. Meighan*, 55 id. 354; *Lowry v. Dillman*, 59 id. 197; *Lemon v. Grosskopf*, 22 id. 447.

It is also well settled that no action can be maintained to recover for goods sold and delivered, or for money loaned or advanced for the purpose of aiding any illegal or criminal enterprise. Money loaned to aid in making a corner in wheat: *Raymond v. Leavitt*, 46 Mich. 447, 41 Am. Rep. 170. Money advanced to aid a corner in stocks: *Sampson v. Shaw*, 101 Mass. 145. Money loaned for the settlement of losses in illegal stock-jobbing: *Cannan v. Bryce*, 3 Barn. & Ald. 179. Goods sold to aid a corner in coal: *Arnot v. P. & E. Coal Co.* 68 N. Y. 558. Money lent to be used in gaming: *McKinnell v. Robinson*, 3 Mees. & W. 434; *Cutler v. Welsh*, 43 N. H. 497; *Mordecai v. Dawkins*, 9 Rich. 262. Goods sold to be used by the Confederate States in aid of the rebellion: *Hanauer v. Doane*, 12 Wall. 342; *Oxford Iron Co. v. Spradley*, 51 Ala. 171; *Booker v. Robbins*, 26 Ark. 660. Sale of liquor on Sunday and without license: *Melchoir v. McCarty*, 31 Wis. 252. Services or losses of broker in wagering contracts for grain: *Irwin v. Williar*, 110 U. S. 499; *Higgins v. McCrea*, 116 id. 671. Moneys paid in furtherance of a contract the object of which is to violate the spirit and policy of a public statute, and not expended: *Perkins v. Savage*, 15 Wend. 412. See, also, *De Groot v. Van Duzer*, 20 id. 390; *Hull v. Ruggles*, 56 N. Y. 424; *Tyler v. Carlisle*, 11 East. Rep. (Me.), 242. Cases holding and applying the same doctrine might be cited almost without number.

The rule that a servant or agent receiving money for his principal will not be permitted to withhold it on the ground that it is the fruit of illegal transactions, is not applicable in the present case. The defendant was not the agent of the plaintiff in the wheat deal, in any other sense than as his partner or associate in a joint adventure. Both parties being *in pari delicto*, the defendant cannot be held to

account. *Lemon v. Grosskopf*, 22 Wis. 447; *Booth v. Hodgson*, 6 Term, 405; *Kirk v. Morrow*, 6 Heisk. 445; *Chappell v. Wysham*, 4 Har. & J. 560; *Brewer v. Kingsberry*, 69 Ga. 754; *Campbell v. Anderson's Adm'r*, 2 Duv. (Ky.), 384; *Wooten v. Miller*, 7 Smedes & M. 380; *Thorne v. Travelers' Ins. Co.* 80 Pa. St. 15; *Rolfe v. Delmar*, 7 Rob. (N. Y.), 80; *Overby v. Overby*, 21 La. Ann. 493.

The charge of fraud does not affect the defense of illegality. The real object of this action is to surcharge the account or compel a re-accounting between the parties in respect to their transactions in the wheat and lard corner speculations. Fraud or mistake in inducing the agreement of July 17, 1883, and the mutual releases therein, if proved, can have no other effect than to remove an obstacle to the enforcement of an accounting in equity. The real cause of action lies back of that agreement and is quite independent of it. It rests upon the agreement of the parties to share equally losses and profits of their unlawful ventures. In none of the cases cited by plaintiff's counsel on this point did the transaction which was infected with fraud originate in or arise out of antecedent criminal transactions in which the two parties were jointly interested.

As to the effect of illegality upon the rights and remedies of parties to contracts tainted therewith, see, generally, note to *Ex parte Pyke*, 25 Eng. (Moak), 650–659; 1 Story's Eq. Jur. secs. 263–296; 1 Lindley on Part. 180–192.

The following opinion was filed January 10, 1888:

Lyon, J. Most, if not all, of the material facts stated in the findings and opinion of the county judge are well sustained by the testimony, and will not be disturbed. The learned judge found that the wheat deal of 1882 and the lard deal of 1883 were illegal transactions, and held that no recovery can be had in this action, because the claim of the plaintiff grows out of such illegal transaction. Upon that

theory, the findings of fact seem to be sufficiently full and comprehensive. Much testimony, however, was given on the trial, directed to questions of fact upon which the findings are silent. During the term at which the decision was rendered and the findings filed, counsel for *Mr. Wells*, the plaintiff, asked the court to make additional findings upon a large number of questions thus omitted therefrom. "Whereupon [as stated in the bill of exceptions] the court ruled that the request should have been made before the findings had been made and filed by the court; and the court refused to pass upon the questions, and dismissed the application, and refused to look into or examine the requests submitted."

The ground upon which such refusal is rested is untenable. A party to an action in which it is the duty of the court to file findings of fact cannot know in advance of such filing what they will be. He may rely upon the presumption that the court will discharge its duty by finding upon all disputed questions of fact involved in the case, and he cannot be put in default because he has failed to indicate to the court in advance the specific facts upon which he desires findings. It is sufficient to secure a review by this court on appeal, if due exception be taken that the findings fail to cover and include certain specified material questions of fact litigated on the trial.

In the view we have taken of this case (which is hereinafter expressed), some of the omitted propositions of fact are material to a correct determination thereof. At the risk of some repetition of what appears in the decision and findings of the county court, a statement of the case, including such omitted facts as the same appear in the pleadings, findings, and evidence, will now be made, after which the law of the case will be considered.

I. From January 1, 1881, to June 16, 1883, the defendant, *Peter McGeoch*, was engaged in the city of Milwaukee in the business of a broker and commission merchant, dealing

in grain and other produce, under the name and style of P. McGeoch & Co. During the same time, he was a partner in the firm of McGeoch, Everingham & Co., which was engaged in a like business in Chicago, operating on the board of trade in that city. There were four partners in the firm, but *McGeoch* owned a one-half interest in its business and profits, and was the leading partner therein.

During the whole time aforesaid, the parties — *Wells* and *McGeoch* — were jointly interested as partners in very extensive transactions in grain, lard, pork, and other commodities. These transactions were mostly in futures, that is, purchases and sales for future delivery, and were conducted by *McGeoch* alone, through his said firm in Chicago and his Milwaukee house. There were many hundreds of such transactions, and they amounted in the aggregate to many millions of dollars.

In February, 1882, the parties settled and adjusted their previous dealings on joint account, and the profits of each were found to be over $300,000. This sum includes the profits of each, amounting to over $278,000, in an extensive deal in pork and ribs. The parties then engaged in a wheat deal in Chicago in connection with others. This speculation is known as the "April (1882) corner in wheat." It was prosecuted with energy, sagacity, and courage, and resulted in a successful corner of the market, and in a net profit to *Wells* and *McGeoch* of $278,705.57, or $139,352.78 each. The final result of this deal was reported by McGeoch, Everingham & Co., at Chicago, to the house of P. McGeoch & Co., at Milwaukee, and the aggregate profit of the two parties was credited in the books of the latter house to XX account. It was not entered up to the credit of the respective parties, because a suit was then pending which might result (but never did) in changing the figures somewhat. The fact that the amount so entered had not been divided between the parties on the books of P. McGeoch & Co.

seems to have been overlooked or forgotten, and so it remained therein as originally entered.    *Wells'* share of the profit on the wheat deal of 1882 was left in the hands of *McGeoch* for future operations, and the credit of $278,705.57 to XX account was transferred to the credit of *McGeoch* alone on the books of the Chicago house.

The joint adventures of the parties, under the direction and management of *McGeoch*, were continued until the failure of the Chicago house, June 16, 1883.    There was a large number of transactions during that time,—some of which resulted in profits to the parties; others, in loss. These were reported to the Milwaukee house, and *Wells'* share of such profits and loss were entered in the books of that house to his account, but stood to the credit of *McGeoch* on the books of McGeoch, Everingham & Co.    On June 16, 1883, the aggregate of profits over losses in those transactions belonging to *Wells* (excluding the lard deal hereafter mentioned) amounted to $100,455.39.

Early in 1883 the parties inaugurated in Chicago what is called a "lard deal;" or perhaps, rather, *McGeoch* inaugurated it, and *Wells* soon thereafter took a joint interest therein with him.    This was a deal in April, May, June, and July lard.    Through the Chicago house they purchased cash lard and lard for future delivery in enormous quantities.    Their transactions amounted to over $12,000,000. Of course, vast sums of money were required to carry on the deal.    *Wells* authorized *McGeoch* to use in the deal all his funds in the hands of *McGeoch*, and the same were so used.    They raised on their individual notes, from various banks, $950,000, and, by hypothecation of cash lard which they held, they raised nearly $4,000,000 more.    To the above sums should be added any sums which *McGeoch* furnished and put into the deal.    All these contracts for lard were made by the firm of McGeoch, Everingham & Co. as principal. No account with *Wells* was kept on the books of that firm,

but the lard-deal account therein was designated as "41." Transactions relating to that deal were frequently, perhaps daily, transmitted to P. McGeoch & Co., at Milwaukee.

To carry the deal to a successful termination, *Wells* and *McGeoch* were forced to buy all the lard in the market. The quantity thrown upon the market was unexpectedly large, and additional large sums of money were required for such purchases, as well as for margins on purchases for future delivery. The financial ability of the operators was not equal to the emergency. The crisis came June 16, 1883. The parties were unable to furnish any more money to their brokers, and the latter could not put up certain large margins regularly required of them under the rules of the board of trade, to which they were subject; so the firm of McGeoch, Everingham & Co. failed and the lard deal collapsed, entailing an enormous loss upon its operators.

Many actions were at once brought against the parties, and against McGeoch, Everingham & Co., by the creditors of that firm, both in Illinois and Wisconsin. Both parties resided in Milwaukee. In one of the suits against the firm of McGeoch, Everingham & Co., a receiver, a Mr. Bensley, was appointed. The appointment was a most fortunate one for the parties interested. The receiver at once qualified and entered upon the duties of his office. He gathered in the scattered assets of the firm, and set himself to ascertain the extent of the disaster and the means of repairing it as far as possible. Before the end of June, he informed the parties that the debts of the firm, estimated at about $1,300,000 (over $1,000,000 of which was on account of the lard deal), could, in his opinion, be compromised at fifty cents on the dollar, if the money could be furnished soon; and that with $450,000 in cash, and the assets of the firm in his hands, estimated at something over $200,000, he could pay all the liabilities, and thus relieve not only the firm, but *Wells* and *McGeoch*, from the enormous indebtedness resulting

from the failure of the lard deal.  Thereupon negotiations were had between the parties, resulting in the contract of July 17, 1883, which is set out in full in the foregoing statement of facts.  Each party paid to the receiver $225,000, as therein agreed; and with that money, and the proceeds of the assets of the firm which came to his hands (such proceeds amounting to nearly $340,000), the receiver procured the discharge of all the indebtedness of the firm, paid all costs in pending suits, and all expenses of his receivership, and paid a surplus of nearly $28,000 to the partners in that firm, other than *McGeoch*.

Thus far the transactions between the parties are narrated in the findings of the county court substantially as here stated, and perhaps more fully.  We now proceed to state certain facts proved on the trial to which little or no reference is made in the findings.

Each party had invested a large sum of money in the lard deal, which was irretrievably lost.  They jointly owed other large sums, for the payment of which both were legally liable.  Utter financial ruin of both was imminent, and, naturally, both were anxious to avert it if possible. The receiver was pressing a compromise upon the creditors of McGeoch, Everingham & Co., and had expressed the opinion to the parties that with the assets in his hands, and $450,000 in cash additional, he could pay off the liabilities of the firm; most of which were incurred on account of the parties in the lard deal.  Under these circumstances, the parties, aided by legal advisers, met, negotiated, and entered into the contract of July 17, 1883. Pending such negotiations, and as part thereof, *McGeoch* represented to *Wells* that the latter had a credit with him of a little over $100,000, being his share of the profits of their joint operations, and that he had invested it in the lard deal, pursuant to the authority which *Wells* gave him to do so.  He also stated to *Wells* that he (*McGeoch*) had

invested $700,000 in the deal, including a note to a bank of $250,000. The parties then owed to banks, on their individual notes, $950,000, including the $250,000 just mentioned. Each was a party to all these notes, either as maker or indorser. *McGeoch* thereupon proposed to *Wells* that he *( Wells )* should assume payment of the remaining $700,000; *McGeoch* assuming payment of the $250,000 note. As *McGeoch* represented the matter, this would make *Wells'* payment on account of the deal, in round numbers, $800,000, and *McGeoch's*, $700,000. To equalize these payments, it was agreed, after some negotiation, that *McGeoch* should pay $25,000 on one of the bank notes assumed by *Wells*, and should give the indemnity contained in the contract of July 17, 1883.

It may be observed here that on the above basis, to have made the payments of these parties equal in amount, *McGeoch* should have paid $50,000 to *Wells* or on his account, whereas he paid $25,000. Thus, *Wells* allowed *McGeoch* $25,000 for the indemnity just mentioned. It is perfectly obvious that the result of this agreement was that *Wells* assumed to pay $25,000 more, and *McGeoch* the same sum less, than one half the losses of the deal. The sums theretofore put in the deal by each party and the sums assumed by each on account of existing indebtedness to banks having thus been adjusted and equalized on the basis of *McGeoch's* representations, each party agreed to raise, and did raise and pay to the receiver, his agreed proportion of the amount estimated to be necessary to discharge the liabilities above mentioned. Such negotiations were had, and the contract of July 17, 1883, was entered into, with the express understanding between the parties that the money of *Wells* in the hands of *McGeoch*, the $675,000 of bank indebtedness assumed by *Wells*, and the $225,000 paid by him to the receiver, equaled one half the losses by the lard deal, plus $25,000, including costs and expenses of closing out

the deal; and that the $275,000 assumed by *McGeoch*, the $225,000 paid by him to the receiver, and the sums put into the deal by him before the failure, would equal one half of such net loss, minus $25,000.

The evidence leaves no room for doubt that *McGeoch* represented to *Wells* that he had put into the lard deal $700,000, including the bank debt of $250,000 assumed by him, or $450,000 without it; and that the balance in his hands to the credit of *Wells* was but $100,455.59. His attorneys, to his knowledge, were notified in writing by the attorneys of *Wells*, before the contract of July 17th was executed, that *Wells* would execute it on the faith of these representations; and neither *McGeoch*, nor his attorneys for him, denied that he made such representations. Further, one of *McGeoch's* attorneys drew and delivered to the attorneys of *Wells* a memorandum in which, after referring to certain indebtedness, it is said that the same " is exclusive of $1,500,000 which the two parties, *Wells* and *McGeoch*, severally owe at the banks, or have raised," etc. The amount owing at the banks was $950,000; leaving $550,000 as the sum raised and put in the deal by both parties. Of this last sum it was stated by *McGeoch* that *Wells* had put in only a little over $100,000; thus leaving his *(McGeoch's)* investment in the deal nearly $450,000, exclusive of the $250,000 raised by him at the bank. This memorandum was so delivered before the contract was signed, and *McGeoch* saw it and made no objection to it. It has the force of a direct statement to *Wells* that he *(McGeoch)* had thus actually invested in the deal $700,000, including the bank debt of $250,000. Besides, the oral testimony alone, on the same subject, is quite sufficient to prove that such representations were repeatedly made by *McGeoch* to *Wells* during the negotiations.

II. The conclusions we have reached as to the law of this case render it necessary to determine the following ques-

tions: *First.* Were such representations true or false? If false, *second,* were they fraudulently made by *McGeoch?* And, *third,* did *Wells* rely upon them, and make and perform the contract of July 17, 1883, on the faith of them, believing them true?

1. Were the above representations true or false? It is admitted by all the counsel that *McGeoch* retained in his hands the share of *Wells* in the profits of the wheat deal of 1882, being $139,352.78, and that he invested the same by authority of *Wells* in the lard deal. Hence the representation by *McGeoch* that the amount of the money of *Wells* in his hands which he so invested was but $100,455.59, was not true; the actual amount was $239,808.17.

As·to the representation by *McGeoch* that he had put into the lard deal $700,000, his counsel claim that it was substantially true. A large amount of testimony is directed to this point; and much argument has been employed, and many ingenious theories advanced, by both sides, to demonstrate the truth or falsity of this representation. To one not an expert accountant, the combination of figures and accounts involved in these theories, and pressed upon us in the argument, are quite bewildering, and it must be added that none of them are satisfactory. Fortunately, the record furnishes us the means of solving the question.

It is an admitted fact in the case that the losses in the lard deal amounted to $2,352,036.52. The proofs are very satisfactory that, by the compromise with the creditors of McGeoch, Everingham & Co., there was released on account of the indebtedness incurred in the lard deal $513,537.76. This appears in the testimony of Stoltz, the book-keeper of that firm, and by an account furnished by him, showing the entries made in the books of that firm, after its debts and the expenses of the receiver had been paid, to balance and close the accounts of the firm. It is undisputed. Moreover, it is just about the sum we should expect to find; for

such indebtedness amounted to something over $1,000,000, and the amount released by the compromise was fifty per cent. thereof. Deducting the amount released by the compromise from the total loss, we have $1,838,498.76, which is the amount paid by both parties on account of losses, including the costs and expenses above mentioned. Of this last sum it is conceded that *Wells* paid $1,139,808.17. As a matter of course, the difference between the two sums last mentioned, which is $698,690.59, is the total sum paid by *McGeoch*. Deduct therefrom the sum afterwards paid by him to the receiver, and we have $473,690.59; which is the amount he had put into the lard deal when he represented to *Wells* that he had thus put in $700,000. He therefore overstated his investment $226,309.41, in addition to the understatement of *Wells'* investment above mentioned. The following table will show the above computation in a more condensed form:

| | | |
|---|---|---|
| Total loss .................. ................................. | | $2,352,036 52 |
| Released by the compromise .......................... | | 513,537 76 |
| Paid by both parties ................................. .... | | $1,838,498 76 |
| *Wells* paid — | | |
| To banks .......... ...................... | $675,000 00 | |
| In *McGeoch's* hands, admitted by him ..... | 100,455 39 | |
| One half profit of wheat deal of 1882, in *McGeoch's* hands, not accounted for by him .............. ..................... | 139,352 78 | |
| Paid to receiver .......................... | 225,000 00 | |
| | | 1,139,808 17 |
| *McGeoch* invested in lard deal ......................... | | $698,690 59 |
| Deduct his payment to receiver ......................... | | 225,000 00 |
| Paid by *McGeoch* before July 17, 1883 .................. | | $473,690 59 |
| *McGeoch* represented his investment to be .............. | | 700,000 00 |
| He actually had invested only .......................... | | 473,690 59 |
| *McGeoch* overstated his payments .......... ............ | | $226,309 41 |
| He understated the amount of *Wells'* money in his hands | | 139,352 78 |
| Total .......................................... | | $365,662 19 |

This method of ascertaining the amount paid into the lard deal by *McGeoch* renders it quite unnecessary to ascertain the sources from whence the money came. The amount may, probably does, include the capital of *McGeoch* invested in the firm of McGeoch, Everingham & Co., and his share of the commissions theretofore earned by that firm. It is maintained by counsel for *Wells* that, by the terms of the settlement between the parties, these items were not to be allowed to *McGeoch*. We do not so understand the proofs. The testimony on that subject was given by Mr. Winfield Smith, one of *Wells'* attorneys, who took a leading part for *Wells* in the negotiations which resulted in the contract of July 17, 1883. He testified that, during the negotiations (probably near the close thereof), he had a conversation with *McGeoch* and Mr. Finch (one of his counsel), in which *McGeoch* assented to the proposition that the capital stock of the firm " was not to be considered one of the debts due from the firm which *McGeoch* and *Wells* would have to assume or endeavor to pay, in whole or in part." This proposition seems to have been carried out. The representations made by *McGeoch* as to the amount he had invested in the lard deal were made before the above conversation took place; and, in order to determine whether such representations were fraudulent or not, *all* the money he so invested, no matter from what source derived, should be allowed him. Moreover, aside from the question of fraud, in an accounting between the parties of their investments in the lard deal, we do not think the above understanding or agreement as to capital is sufficiently broad to exclude the allowance to *McGeoch* of the proceeds of his share of capital and commissions which he had theretofore drawn out and invested in such deal. The allowance of these items to him does not seem to conflict with the agreement that the capital stock of the firm was not to be considered a debt of the firm which the parties were to assume

or endeavor to pay. The agreement was satisfied when, by the failure of the firm, the partners therein, other than *McGeoch*, lost a large portion of the capital they had invested in the business. *McGeoch's* capital and his share of the commissions had already been drawn out and invested in the deal, and the amount thereof thereby ceased to be a liability of the firm. The agreement affects only such capital as remained a liability of the firm.

2. Having determined that *McGeoch*, in his own interest, overstated to *Wells* his investment in the lard deal, and understated the amount of *Wells'* money in his hands which he *(McGeoch)* invested in the same deal, and having determined, also, the aggregate amount thus overstated and understated, we will now proceed to consider whether such misrepresentations were fraudulently made by *McGeoch*.

This question requires but little discussion. If *McGeoch* knew that he was overstating his own investment or understating the amount of *Wells'* money in his hands which he invested in the lard deal, his representations were fraudulent. If such representations were made in ignorance of the real facts, they were equally fraudulent; the fraud in the latter case consisting in his assuming to know facts adverse to the interests of *Wells*, which he knew nothing about and which had no existence. *Miner v. Medbury*, 6 Wis. 295.

It would be unreasonable to hold *McGeoch* to the duty of exact knowledge of the amount of his investments, but it is not unreasonable to hold him to the duty of knowing approximately such amounts. The books of his two houses, at Chicago and Milwaukee, would have shown those facts with reasonable accuracy, had he consulted them; and it would not have been a difficult matter for him to obtain the information at very short notice. The county court found that he was no book-keeper, but this finding must be taken with some qualification; it probably means that he

was not an expert book-keeper. It certainly cannot be truthfully said of a man who had capacity to conduct, and did conduct, commercial transactions amounting to millions of dollars in each year, usually with great success, and who can claim rank with the ablest business men in the country, that he has no knowledge of book-keeping. But, if he was unable to ascertain the amount of his investments by a personal examination of his own books, he had in his employment capable, expert book-keepers, who kept such books and knew all about their contents, who, if desired, would readily have given him the required information. In the circumstances of this case, there is no admissible theory upon which it can be truly said that such misrepresentations are consistent with honesty of purpose. He either knew that the representations were grossly false, or he made them recklessly, without stopping to inquire whether they were true or false. In either case, as before observed, the misrepresentations were fraudulent.

3. We are now to inquire whether *Wells* relied upon such false and fraudulent misrepresentations made by *McGeoch*, and made and performed the contract of July 17, 1883, on the faith of them, believing them to be true. The proofs tend to show that accounts of the transactions in Chicago in the lard deal were frequently transmitted to P. McGeoch & Co., at Milwaukee, and that *Wells* had free access to them. From this it is argued that he might have known, had he taken the trouble to investigate, the true condition of the deal at any given time, and that his failure to do so was negligence which is fatal to his right to recover in this action. It may be true that *Wells* had access to the means of thus ascertaining the condition of the deal and the amount invested therein by *McGeoch;* but it is certain that he did not do so. When we consider the extent and magnitude of the transactions of the deal, the length of time which they cover, and that none of them occurred

under the personal supervision of *Wells;* and the further facts, which clearly appear in the evidence, that *Wells* had most unbounded confidence in the ability and integrity of *McGeoch,* and in none of their numerous transactions had he given any personal attention thereto, but trusted entirely to *McGeoch,*— we cannot say that he was guilty of negligence in failing to keep himself personally advised of the condition of the deal. In other words, we think he had a right to rely upon the representations of *McGeoch* in respect to the amount of money invested by him in the deal, both of his own money and that of *Wells.*

As to the $139,000 of *Wells'* money in his hands, being the profit of the wheat deal of 1882, it is sufficient to say that *Wells* had not forgotten that he had that sum in the hands of *McGeoch,* but he supposed the dealings on their joint account, after the wheat deal, had reduced that amount to a little over $100,000. The representation of *McGeoch* in that behalf was, in effect (though not in words), that it had been so reduced. *Wells* had kept no account of those dealings; trusting, as he had a right to do, to the integrity of *McGeoch* to properly account for all sums in his hands. He was justifiably ignorant of the fact that their joint dealings, after the wheat deal, had resulted in a profit to him of over $100,000, which *McGeoch* had in his hands, leaving the $139,000 intact. *McGeoch* cannot now be heard to say, after *Wells* had trusted him so implicitly, that, although he grossly and fraudulently misrepresented the amount of their respective investments, still *Wells* had no right to believe his statements. We do not care to discuss this question further. The testimony convinces us that *Wells* had the right to rely upon the statement of *McGeoch* in the premises, that he did rely upon them implicitly, and that on the faith of them, and believing them to be true, he paid a very large sum of money to discharge their joint liabilities over and above what he ought to have paid on the

basis upon which the transactions were settled, and what he would have paid had *McGeoch* truly stated his investments.

III. We are now to consider the law of the case applicable to the foregoing facts. The judgment of the county court is rested upon the propositions that the wheat deal of 1882 and the lard deal of 1883 contravened a statute of Illinois, and were illegal transactions; that *Wells* was obliged to trace his alleged right to recover in this action through such illegal transactions; and hence that he cannot recover therein.

In addition to pleading the illegality of those deals as defenses to the action, *McGeoch*, through his counsel, has expressed to us, in strong and earnest language, the wrong and injustice and the enormity of the evils which necessarily result from such illegal transactions, and has also denounced them as crimes against the public. Also, counsel cited several cases in which, in most impressive language, the immorality and illegality of such transactions are asserted. We cordially indorse all that was said to us on that subject in the arguments, as well as the language of the courts to which our attention has been called. When we said in *Melchoir v. McCarty*, 31 Wis. 252, that "all contracts which are repugnant to justice, or founded upon an immoral consideration, or which are against the general policy of the common law, or contrary to the provisions of any statute, are void; and that if a party claiming a right to recover a debt is obliged to trace his title or right to the debt through any such illegal contract, he cannot recover, because he cannot be allowed to prove the illegal contract as the foundation for his right of recovery," — we stated the rule as strongly as any court has stated it. To that rule this court has rigorously adhered. The rule is elementary, and we are not aware of any adjudication which has denied or shaken it. Numerous cases sustaining it will be

found in the brief of the learned counsel for *McGeoch*. It is unnecessary to cite them here, but reference to them will be made in the report of the case. Thus far, we are in entire accord with *McGeoch,* his counsel, and the learned county judge.

We have no doubt the county court ruled correctly that the wheat deal of 1882 and the lard deal of 1883 were illegal transactions, under the statutes of the state of Illinois. They were also illegal at the common law, as against public policy. However, the nature of the wheat deal of 1882 seems to be of little importance in the case. *Wells'* share in the profits of that deal was left in the hands of *McGeoch,* and by him invested in the lard deal by consent and direction of *Wells.* Had *McGeoch* paid the $139,000 to *Wells,* and had *Wells* subsequently returned it, or a like amount, to *McGeoch,* to be invested in the lard deal, it would not be claimed, we think, by any one, that the illegality of the wheat deal would alone protect *McGeoch* from accounting to *Wells* for the money. We think the transaction which actually took place is, in legal effect, the exact equivalent of the one supposed.

2. If it be true, as the county court held, that, in order to establish his demand against *McGeoch, Wells* was obliged to trace his claim through such illegal transactions, the county court was right in dismissing the complaint. We are clearly of the opinion, however, that the ruling of the county court in this behalf is erroneous. The *gravamen* of this action is the fraud of *McGeoch* in misrepresenting to *Wells* the amount of their respective investments in the lard deal. Although, in form, the demand of the complaint is that the account of the transactions in that deal should be surcharged and corrected, yet, in substance and effect, the action is to recover damages suffered by *Wells* by reason of the fraud of *McGeoch.* The lard transaction is only involved incidentally in the case. It is resorted to only for

the purpose of ascertaining whether the representations made by *McGeoch* were true or false. There is no rule of law which prohibits a resort to an illegal contract for a purpose so purely incidental. The case is within the principle laid down in *Kiewert v. Rindskopf*, 46 Wis. 481. In the opinion by Mr. Justice ORTON, it is there said: "The *gravamen* of this action is the fraud practiced by the defendant in obtaining the two thousand dollars from the plaintiff by falsely representing that this sum was within and a part of the contract with Wight, and that the sum agreed to be paid to Wight was *three* thousand dollars, when in fact it was only *one* thousand dollars. Where money is so charged to have been obtained by fraudulent representations, the only material questions to be considered are: *First.* Were such representations intentional, material, and false? *Second.* Did they produce a false impression on the mind? *Third.* Were they the inducement of the payment? *Fourth.* Were they relied upon as being true? If these elements are present, they constitute a positive fraud without exception; and the matters to which such fraudulent representations relate, whether legal or illegal, will not lessen the fraud, or affect the liability of the guilty party. Kerr, Fraud & M. 73; *Smith v. Mariner*, 5 Wis. 551; *Kelley v. Sheldon*, 8 Wis. 258; *Reynell v. Sprye*, 21 Law J. Ch. 633."

There is no serious conflict of authority on this subject. Nearly all the cases involving the question are in harmony with *Kiewert v. Rindskopf*. Many of these cases are cited in the brief of counsel for *Wells*, and will be preserved in the statement of their argument in the report of the case.

All the conditions of a recovery required in *Kiewert v. Rindskopf* are established in this action; hence *Wells* is entitled to recover.

3. It is scarcely necessary to add that the full release of *McGeoch* by *Wells* from all claims and demands on

account of the lard deal, contained in the contract of July
17, 1883, is no obstacle to a recovery in this action; the
contract having been obtained by the fraud of *McGeoch*.
Such release may have excluded *Wells* from any share of
the money remaining in the receiver's hands after his trust
was executed, but it is not perceived how it can conclude
*Wells* in this action, which is founded upon the fraud of
*McGeoch*.

IV. The only remaining question is that of damages. The
*gravamen* of the action being the fraud alleged, it is plain
that *Wells* should recover all that he paid, by reason of such
fraud, in excess of what he would have been required to
pay on the agreed basis had *McGeoch* represented the in-
vestments truthfully. That is to say he may recover what he
lost by reason of the fraud. But he cannot recover a sum
which will reduce his payments on account of the lard deal
below what he would have been required to pay on an ac-
counting between the parties, for it cannot be correctly said
that he has lost anything beyond that limit. The amount
of such loss is easily ascertained. It is measured by the ex-
tent of the misrepresentations by *McGeoch* in his own
favor, subject to the limitation just mentioned. We have
already seen that these amount to $365,662.19 against
*Wells*. Hence, in order to indemnify *Wells* for the conse-
quences of *McGeoch's* fraud, the latter should pay *Wells* one
half the amount last above stated, to wit, $182,831.10, less
any sum necessary to be deducted in order to make *Wells'*
payments equal the amount he ought to pay, as that amount
would be ascertained were an account of the lard deal stated
between the parties. This will place *Wells* in the same
position that he would have been in had *McGeoch* represented
their respective investments truly, and had the amount that
each, upon the agreed basis, ought to have paid, been ad-
justed accordingly.

In order to find whether one half the aggregate of *McGeoch's* misrepresentations of the investments made by him in the lard deal for himself and for *Wells* exceeds the sum which *Wells* ought to recover, we will see how an account stated would stand:

| | |
|---|---:|
| Both parties paid.......................................... | $1,838,498 76 |
| One half is................................................ | $919,249 38 |
| *Wells* agreed to pay, in addition......................... | 25,000 00 |
| *Wells* ought to pay....................................... | $944,249 38 |
| He paid.................................................... | 1,139,808 17 |
| *Wells* overpaid........................................... | $195,558 79 |
| *McGeoch* ought to pay..................................... | $894,249 38 |
| He paid only.............................................. | 698,690 59 |
| *McGeoch's* deficiency..................................... | $195,558 79 |

But there remained in the hands of the receiver after the business was closed and all demands paid, the sum of $27,836.32. In the absence of a special agreement to the contrary, this money belonged to the parties in equal shares. Hence, in the accounting, $13,918.16 should be deducted from *Wells'* overpayment, as above stated, to find the maximum limit of his recovery. Had there been no surplus, *Wells* would recover $182,831.10, and would be compelled to lose the difference between that sum and the amount he overpaid ($195,558.79), because of the illegality of the lard deal, which bars a recovery on an account stated. But, inasmuch as there was a surplus, we state the account in the interest of *McGeoch*, and find that the recovery should be reduced to $195,558.79 — $13,918.16= $181,640.63.

*By the Court.*— The judgment of the county court is reversed, and the cause will be remanded with directions to its successor, the superior court, to render judgment for the plaintiff for $181,640.63, and interest thereon at seven per

cent. per annum from July 17, 1883, to the date of the judgment.

A motion by the respondent for a rehearing was denied March 27, 1888.