LOUIS B. ADAMS and Others, Appellants, *v.*
EDWARD A. REED and Others, Respondents.[1]

1. Public Lands.—Railroad Grants.—Reservations in the Grant.
—Quality of Title Before and After Patent.—United States
under act of Congress of July 1, 1862, granted to the Union
Pacific Railway Company " every alternate section of public
land designated by odd numbers to the amount of five alter-
nate sections per mile on each side of the railroad on the line
thereof, and within the limits of ten miles on each side of
said road, not sold, reserved, or otherwise disposed of by the
United States, and to which pre-emption or homestead claim
may not have attached at the time the line of said road is
definitely fixed; *provided,* that all mineral lands shall be ex-
cepted from the operations of this act." *Held,* that the grant
to the company was in the nature of a " floating grant," but
became settled when the line of the road was " definitely
fixed," and was a grant *in præsenti* and as to the lands em-
braced within its limits, which were not within the exceptions
or reservations, the title took effect upon identification as of
the date of the grant, but as to the lands containing minerals
whether known or unknown, the railroad company took a base
or determinable fee which ripened into fee simple only upon
issuance of patent by the United States.

2. Id.—Id.—Reservations in Deed.—Fee Simple.—A deed reserv-
ing the right to prospect for " coal and other minerals," and
to mine and remove the same, if found on the land conveyed,
does not convey a fee-simple, and a quitclaim deed releasing
the right reserved as to coal only, does not cure the defect.

3. Id.—Id.—False Representations as to Title Without Fraud-
ulent Intent.—Misdescription.—When Equity Treats War-
ranty Deed as Executory Contract.—Rescission.—Where
one without fraudulent intention represents that he holds a
fee simple to land when in fact he does not, and executes a
warranty deed of the same which describes the land as being
in a certain section when in fact it is located in a different

---

[1] Appealed to the Supreme Court of the United States June 3, 1895.

section, equity will treat the deed as an executory contract conveying a chose in action and not an executed contract conveying a chose in possession, and may decree a rescission of the contract.

4. REPRESENTATIONS AS TO TITLE.—WHEN FRAUDULENT.—Representations as to the character of one's title to land are more than mere expressions of opinion when they are confirmations of a material fact and inducements to a contract and when untrue and material they are fraudulent.

5. ID.—ID.—RECONVEYANCE.—Where a grantor represents without fraudulent intent that he holds a fee simple title to land, when in fact, he does not, and executes a warranty deed for the same, which describes the land as being in a certain section, when, in fact, it is in another section, the grantee having given notice of the rescission of the contract after the discovery of the defect in the title, need not offer to reconvey on bringing suit to recover money paid and for cancellation of the notes and mortgage given as purchase price.

(No. 557. Decided June 3, 1895. 40 P. R. 720.)

APPEAL from the District Court of the Fourth Judicial District. Hon. James A. Miner, *Judge.*

Action by Louis B. Adams and Watson N. Shilling against Edward A. Reed, H. H. Henderson and others for the reformation and foreclosure of a mortgage. Defendants filed a cross complaint asking for a return of the money paid and for the cancellation of the mortgage and notes given as the purchase price, on the ground of failure of title. From a judgment for defendants confirming the report of Honorable Jacob S. Boreman, special master in chancery, plaintiffs appeal. *Affirmed.*

*Mr. P. L. Williams, Messrs. Kimball & Kimball,* and *Messrs. Bennett, Marshall & Bradley,* for appellants.

The act in question by its language was a grant *in*

*præsenti* and granted the legal title to all the lands within the grant limit, whether surveyed and selected or not by the railroad company, and that such grant was a legal title. The same construction has been placed upon the grant by the supreme court .of the United States in a great many cases, to wit: *Schulenberg* v. *Harriman,* 21 Wall. 44; *Ry. Co.* v. *United States,* 92 U. S. 733; *Ry. Co.* v. *Ry. Co.,* 97 U. S. 491; *Ry. Co.* v. *Baldwin,* 103 U. S. 426; *Grinnell* v. *Ry. Co.,* 103 U. S. 739; *Wright* v. *Rose-berry,* 121 U. S. 488; *Rutherford* v. *Greene Heirs,* 2 Wheat. 196. And by Judge Field, sitting in the District Court of the District of California, in the case of *Denny* v. *Dodson,* 32 Fed. Rep. 889. The supreme court of the United States again in the case of the *Deseret Salt Co.* v. *Tarpey,* 142 U. S. 241, S. C. L. Ed. Bk. 35, p. 999, decided that the act of July, 1862, granting land to the Union Pacific Railway Company, transfers a present legal title when the lands are identified by .the location of the road.

It appears from finding 26, that respondents went into possession of the real estate in controversy and leased the same to the appellants, and that they have ever since the 28th of March, 1800, continued in such possession thereof up to and including the time of trial. This being so, they cannot avail themselves of either an outstanding title or incumbrance, for until an eviction they have no cause of action against appellants. Indeed, they could not maintain an action upon a covenant of warranty of title until such eviction. Warvelle on Vendors, p. 1004; 2 Jones on Mort. §§ 1501, 1502. The above is the rule laid down where the contract of sale and purchase is executory. · The rule is much stronger in favor of appellants where the contract is an executed one. Warvelle on Vendors, p. 844.

*Mr. H. H. Henderson* and *Messrs. Richards & Mac-Millan*, for respondents.

The court finds that the lands in controversy are and have been used and cultivated as agricultural lands, and also that no exploration nor examination has been made for coal or minerals of any kind or description. No court could find as to the character of the land until that question had been passed upon and determined by the proper officers of the land office of the United States, and the only evidence of such determination is the patent. *Barden* v. *Northern Pac. Ry. Co.,* 154 U. S. 320. The court will not take judicial knowledge of the fact that the lands were surveyed as early as 1868 or 1869 and returned as agricultural in character by the surveyor general, but the contrary is the rule; all these facts must be proven. *Ankeny* v. *Clark,* 148 U. S. 357; S. C. 37 L. Ed. 475.

The case of *Ankeny* v. *Clark,* we claim to be decisive of the case at issue. *Ankeny* v. *Clark* was a case where Ankeny acquired certain agricultural lands through certain conveyances from the Northern Pac. Ry. Co. and had contracted with Clark to deed him the same when the purchase price had been paid. Clark paid the purchase price and Ankeny refused to give him a warranty deed but did tender him a quit-claim deed of the railroad land, which Clark refused to accept. Then Clark sued Ankeny for the purchase price paid, and the court in that case said that inasmuch, under the stipulation of facts, that it was a railroad grant and it not appearing that the survey charges had been paid or that a patent had been obtained from the United States to the railroad, a clear title did not appear to be in Ankeny; and it was further decided that in case that even if Ankeny had tendered Clark a full warranty deed, Clark could not have been compelled to accept the same. In this case the court clearly dis-

tinguished what kind of a title a railroad company obtains under a land grant of congress, and explains what was meant to be decided in the case of *Tarpy* v. *Deseret Salt Co.*

The supreme court of the United States in the case of *Barden* v. *Northern Pac. Ry. Co.*, 154 U. S. p. 342, explains many of the decisions heretofore rendered by that court and lays down the latest rule, and explains what title railroad companies receive to lands under the various grants of Congress. On page 315 of the opinion the court say: "Such is the purport and sole purport of the cases of *St. Paul & Pac. R. R. Co.* v. *Northern Pac. Co.*, 139 U. S. 1, 5, and *Deseret Salt Co.* v. *Tarpey*, 142 U. S. 241, 247. In both of those cases the writer of this opinion had the honor to write the opinions of this court, and it was never asserted or pretended that they decided anything whatever respecting the minerals, but only that the title to the lands granted took effect within certain designated exceptions as of the date of the grant. They never decided anything else. And what was the title? It was of the lands which at the time of the grant were not reserved as mineral, and of lands which at the time of the location had not been sold, reserved, or to which a pre-emption or homestead right had not attached. * * * It seems to us as plain as language can make it that the intention of Congress was to exclude from the grant actual mineral lands, *whether known or unknown,* and not merely such as were at the time known to be mineral."

"The contention that no recovery can be had because the incumbrance was a matter of record, is not sound. A fraudulent representation, by one who assumes to have personal knowledge, to the purchaser of real estate, that there is no incumbrance thereon, and upon which representations the purchaser relies and acts to his injury, will sustain an action for the tort, although the purchaser

might have discovered the fraud by searching the records."
*McKee* v. *Eaton,* 26 Kas. 226; *Curtis* v. *Stitson,* 38 Kas.
302; 16 Pac. Rep. 678; *David* v. *Park,* 103 Mass. 501;
*Babcock* v. *Case,* 61 Pa. St. Rep. 427; *Allen* v. *Green,* 5
McCrary, 380; 17 Fed. Rep. 407. And in *Allen* v. *Ham-
mond,* 11 Pet. p. 72, the court says: "The law on this
subject is clearly stated in the case of *Hitchcock* v. *Bid-
dings* (Daniel's Rep. 1), where it is said that a vendor is
bound to know that he actually has that which he pro-
fesses to sell." And Warvelle on Vendors, vol. 2, p 858,
says: "False representations by the vendor as to nature,
quantity or quality of the property, or of the title by
which it is held, will entitle the vendee to a rescission of
the contract." And the same author says at page 945,
"In some instances it has been held that a defect or
incumbrance not known to the vendee, when he accepts the
deed, is a defense to a bond for purchase money, although
there be a general warranty." *Peck* v. *Jones,* 70 Pa. St. 83.

"A distinct statement of such fact by a seller, knowing
it to be false, and with intent to deceive the buyer,
and on which the buyer acts to his own injury, will
sustain an action for deceit, even if the buyer might
have discovered the fraud by searching the records
of the patent office." *David* v. *Parker,* 103 Mass.
501; *Claggett* v. *Crall,* 12 Kas. 393. "A distinct statement
of a fact by a seller, knowing it to be false, and with an
intent to deceive the buyer, and on which the buyer acts
to his own injury, will sustain an action of deceit, even if
the buyer might have discovered the fraud by searching
the records." *David* v. *Parker,* 103 Mass. 501. "The
falsity and fraud consists in representing that he knows
the facts to be true, and this renders him liable to a party
who relies and acts upon the statements as true." *Litch-
field* v. *Hutchinson,* 117 Mass. 195; *Linn* v. *Green,* 17 Fed.
Rep. 207. Equity will grant relief on the ground of fraud,

although the party representing the material fact made the assertion, not knowing whether it was true or not. *Wilcox* v. *Iowa Wesleyan University,* 32 Ia. 367; Williard's Eq. Jur. 150; *Ainslie* v. *Medlysott,* 9 Ves. 91; *Smith* v. *Richards,* 13 Pet. 38; *Harding* v. *Randall,* 3 Me. 332; *Trumbull* v. *Gadsden,* 2 S. C. Eq. 14; *McFadden* v. *Taylor,* 3 Cranch, 281. "An incumbrance is defined to be any right to or interest in land which may subsist in third persons to the diminution of the value of the land and not inconsistent with the passing of the fee in it by the deed of conveyance." *Burr* v. *Lamaster,* 46 N. W. 1016 and citations. A purchaser of vacant real estate receiving a deed therefor with a covenant of seisin from one who has no title, the covenant being wholly broken, is not compelled, at least after he has commenced an action for a breach of the covenant for the recovery of the purchase money paid, to accept a title which his grantor may then acquire. *Reeser* v. *Carney,* 54 N. W. 89. An incumbrance within the terms of a covenant against incumbrances includes every right to or interest in the land to the diminution of the value of the land, but consistent with the passage of the fee for the land. 20 N. E. 581; 10 Am. St. Rep. 433.

APPELLANTS' BRIEF IN REPLY.

The referee found that the representation as to title was made as alleged, and it was in fact untrue, but failed to find any scienter or any fact inconsistent with the most perfect good faith in plaintiffs when they made the representation. "Where a deed is executed in pursuance of a contract for the sale of land, all prior proposals and stipulations are merged, and the deed is deemed to express the final and entire contract between the parties." Per Cur. in *Williams* v. *Hathaway,* 19 Pick. 488; *Jones* v. *Wood,* 16 Pa. St. 25; *Carter* v. *Beck,* 40 Ala. 599. In Dart's Ven-

dors & Purchasers, Ch. 14, § 5, the rule is thus laid down: " With some few special exceptions a purchaser, after the conveyance is executed by all necessary parties, has no remedy at law or in equity in respect of defects either in the title to or quantity or quality of the estate which are not covered by the vendor's covenants." So, Field, in delivering the opinion of the court in *Andrus* v. *Smelting Co.*, 130 U. S. 643–648, said: "Where the vendor holding in good faith under an instrument purporting to transfer the premises to him or under a judicial determination of a claim to them in his favor executes a conveyance to the purchaser, with a warranty of title and a covenant for peaceable possession, his previous representations as to the validity of his title, or the right of possession which it gives, are regarded, however highly colored, as mere expressions of confidence in his title, and are merged in the warranty and covenant which determine the extent of his liability." That no misrepresentation, unless it be wilful, furnishes an exception to the rule, is well settled.

In *Wilde* v. *Gibson*, 1 H. L. C. 605, it appeared that. Lady Wilde sold certain building lands to Mr. Gibson, the lands were described as unaffected by any right of way over them. After the purchase was completed the vendee discovered that a public way passed through the property and that the vendor's mother—from whom she inherited the land—had executed a deed to the authorities of the town acknowledging the right of way and covenanting to pay a nominal rent each year for the privilege of inclosing the portion of the land over which it ran, and to open it. whenever required. This rent had been regularly paid down to the date of the sale. Lady Wilde had no actual knowledge of the existence of this deed or of the payment of the rent. The town authorities required the old way to be opened and Gibson then filed his bill to set

aside the conveyance to him and to recover the purchase money, and Knight Bruce, V. C., entirely acquitting Lady Wilde of personal fraud or deception in the matter, set aside the conveyance. Upon appeal to the House of Lords, this decree was reversed. In *Joliffe* v. *Baker*, L. R. 11 Q. B. Div. 255, the vendor represented that a certain lot contained three acres; the vendee bought on the faith of this representation, paid the purchase money and received his deed. The vendor had himself bought the same lot as containing three acres and believed on some reason that his representations were true. On a survey, it was ascertained that there was only about two and one-fourth acres in the lot and the vendee sued for compensation for the deficiency, alleging the misrepresentation of his vendor, which he claimed to have been fraudulent. The plaintiff recovered judgment in the court below. On appeal it was strenuously urged in support of this judgment that the misrepresentation as to the quantity of land was a legal fraud even if there were no intended deceit. The judgment was reversed.

The rule is the same in equity as at law after a conveyance. Nothing short of moral fraud as distinguished from legal fraud will justify a decree of rescission for misrepresentation. *Southern Development Co.* v. *Silva*, 125 U. S. 247; *Wilde* v. *Gibson*, 1 H. L. C. 632; *Joliffe* v. *Baker*, L. R. 11 Q. B. D. 272; *Brownlie* v. *Campbell*, L. R. 5 A. C. 937; *Key* v. *Jennings*, 66 Mo. 356; *Clark* v. *Tennant*, 5 Neb. 549. Notwithstanding the mistake the equitable title to the land intended to be conveyed was vested in the defendants. 2 Beach Eq. Jur. § 542, p. 615; *Bush* v. *Bush*, 33 Kas. 556; *Crawford* v. *Edwards*, 33 Mich. 354.

BRIEF OF RESPONDENTS IN ANSWER TO APPELLANT'S REPLY.

The questions raised in appellant's reply are raised for

the first time in this case. It needs no authorities to support a rule so long and carefully observed by courts of appeal, that to entitle any point to be adjudicated in the appellate court it must have been raised in the lower court. When a person by means of false representations of facts materially affecting the identity and value of real estate, induces another to enter into a contract for the purchase thereof, upon the faith of such representations, and upon which he was justified in relying, the purchaser may, in an action brought by the vendor, for the purchase price, recoup the damages which he sustained by reason of such false representations, although the vendor believed them to be true when made, and had good reason for so believing. *Mulvey* v. *King,* 39 Ohio St. p, 491; Bishop on Contracts, § 662; *Day* v. *Lown,* 1 N. W. 790, 51 Ia. 364.

"In setting up a material misrepresentation to defeat the specific performance of a contract the element of a scienter, of knowledge, of belief with or without reasonable grounds, or of intent, is wholly unnecessary and immaterial. So far as this most essential element of a fraudulent misrepresentation is concerned, it is sufficient to defeat a specific performance that the statement is actually untrue so as to mislead the party to whom it is addressed." Pomeroy Eq. Jur. 887 and note 2; 888 and authorities cited to note at page 1249. Pom. Eq. Jur. § 889, and authorities cited to note on page 1250: "It is often said that, in order to render false representations fraudulent in law, it must be made to appear that the party making them knew at the time that they were untrue. But this rule has so many exceptions that it is difficult to affirm, with any confidence, that it is a general rule at all." "Whether the party thus misrepresenting a material fact, knew it to be false, or made the assertion without knowing whether it were true or false, is wholly immaterial; for the affirmation of what one does not know

or believe to be true is equally, in morals and law, as unjustifiable as the affirmation of what is known to be positively false; and even if the party innocently misrepresents a material fact by mistake, it is equally conclusive, for it operates as a surprise and imposition upon the other party." Cooley on Torts (2d ed.), p. 582, star p. 498; Storey Eq. Jur. § 193; *Mayer* v. *Salazar,* 84 Cal. 650.

KING, J.:

The plaintiffs allege in their complaint that in March, 1890, they were the owners and entitled to the possession of certain land in Weber county; that on the 27th of said month they sold said estate to defendants, and executed a warranty deed, but by mistake said property was described as being in township 6, instead of 5; that on the 29th of September, 1891, as soon as said mistake was discovered, they made a quitclaim deed to defendants, correctly describing the land intended to be conveyed, which they tendered to defendants, and now bring into court; that, in part payment for said land, defendants executed two promissory notes, which were secured by a mortgage on the land, but which mortgage contained the same error in description as said deed. Plaintiffs pray for the reformation of the mortgage and for its foreclosure. Defendants answered and filed a cross complaint, in which they averred that relying upon the representations of plaintiffs that they owned, and had a good title in fee simple to, 440 acres of land lying near Ogden city, and without investigating the title or seeing the land, they purchased an undivided two-thirds interest, and executed the mortgage described in plaintiffs' complaint in part payment of the purchase price; that subsequently they ascertained that plaintiffs were not the owners of, and did not have an indefeasible and fee-simple title to, said land, or any title to the land conveyed; that thereupon they

demanded back the amount paid to plaintiffs, and the surrender and cancellation of the notes given in part payment; that said representations as to title were false and fraudulent, which plaintiffs then and there knew, and were made to deceive defendants. There are further allegations in the cross complaint with respect to the character of plaintiffs' title and the fraudulent representations. Defendants pray that the mortgage and notes be cancelled and delivered up.

The principal questions presented for our determination are: (1) Did the Union Pacific Railway Company have a fee-simple title to the land claimed in township 5, which plaintiffs attempted to convey to defendants? (2) If so, was this title conveyed to defendants? (3) If the above questions are determined negatively, then was there such fraud upon the part of plaintiffs as to be the foundation for the rescission of the contract between plaintiffs and defendants? (4) Do the facts of the case show a rescission?

1. By the act of Congress passed July 1, 1862, certain lands were granted to the Union Pacific Railroad Company for the purpose of aiding in the construction of a transcontinental railroad. The language of the grant is: "There be and is hereby granted to the said company * * * every alternate section of public land designated by odd numbers to the amount of five alternate sections per mile on each side of the railroad on the line thereof, and within the limits of ten miles on each side of said road, not sold, reserved, or otherwise disposed of by the United States, and to which pre-emption or homestead claim would have attached at the time the line of said road is definitely fixed: provided that all mineral lands shall be excepted from the operations of this act." It is admitted that the land in controversy in this suit is within this grant, and that no patent has ever been issued there-

for. The court below, adopting the findings of the referee, found that the land has been and still is used for agricultural purposes; also that no exploration or examination has been made for coal or minerals of any kind. Appellants' contention is that the act of Congress above referred to was a grant *in præsenti*, and passed the present legal title—at least as soon as the road was constructed, and the identification of the sections became possible—to all of the lands embraced within it, except those to which a preemption or homestead claim had attached, and which were not known to contain mineral. Respondents' claim is that no exploration or examination having been •made by the government to ascertain whether the lands were mineral or nonmineral, and no patent having been issued, an imperfect and defeasible title passed by the grant to the railroad company.

Our attention is invited to numerous cases decided by the supreme court of the United States, and other courts, wherein this and similar grants to railroad companies are construed. The language of these decisions seems, to the writer of this opinion, clear and unambiguous. By many it is declared that by their terms these grants import a grant *in præsenti*, carrying at once the interest of the grantor in the lands described, and, while the grant is in the nature of a "float," when the route of the road is definitely fixed the lands granted become susceptible of identification, and the title attaches as of the date of the grant, and has the same effect upon the selected parcels as if they had been specifically described in the acts of Congress. To me it seems there is much force in this contention of appellants. The Union Pacific Railroad has been completed for more than a quarter of · a century. The government has not explored the lands to ascertain whether they contain minerals. There is nothing to evidence a purpose upon its part to make such exploration.

The railroad was entitled to a patent as soon as the commissioners, appointed by the president of the United States, reported the completion and equipment of the road. The supreme court of the United States has declared, in effect, that patents are unnecessary to divest the United States of its title, and invest the grantee therewith. Patents "* * * identify the lands as coterminous with the completed section, but they would be evidence that, as to that portion of the road, the conditions of the grant had been complied with. * * * As deeds of further assurance, they would thus be of great value, in giving quiet and peace to the grantee's possession." *St. Paul & P. R. Co.* v. *Northern Pac. R. Co.*, 139 U. S. 1, 11 Sup. Ct. 889. The decisions cited by appellants seem to have regarded the mineral reservations in these grants as reaching only such lands as were known to contain minerals at the time of the grant. But it would be profitless to enter into a discussion of this phase of the subject, and analyze the authorities collated, for the reason that they are ably considered and exhaustively treated by Mr. Justice Brewer in his dissenting opinion in the case of *Barden* v. *Railway Co.*, 154 U. S. 332, 14 Sup. Ct. 1030. The writer of this opinion acknowledges the almost unanswerable arguments adduced by the learned justice, but recognizes that this court is bound by the majority opinion in that case. But it must be confessed that this opinion cannot easily be reconciled with very many utterances of that high tribunal.

Appellants' counsel insist that the case last cited is not decisive of the point now under consideration. Counsel for respondents contends, with equal vehemence, that under this decision, until patent issues, no indefeasible title to the lands within the grant passes to the grantee. An examination of the grant to the Northern Pacific Railroad Company shows that the words there employed are almost

identical with those found in the grant to the Union Pacific. The words in the former are, " to every alternate section of public land not mineral;" and the following proviso is attached to the granting section of the act: " Provided, that all mineral lands be and the same are hereby excluded from the operations of this act," etc. Applying the doctrine enunciated in the Barden case, it would seem that, at any time before exploration for minerals and the issuance of patents, the government can, upon the discovery of minerals within the land granted, not only refuse patent for such lands as contain mineral, but dispose of them to others than the grantee or its vendees, and that such grantee or vendees would not possess an indefeasible title to all the lands embraced within the grant. In the Barden case, just cited, the court held that the words quoted were an exclusive reservation of all minerals to the United States, and that it was immaterial whether there was knowledge of the existence of mineral deposits; if discovered at any time before patent, no title passed from the government. Some of the cases upon which appellants rely are considered and explained. Speaking of *St. Paul & P. R. Co.* v. *Northern Pacific R. Co.*, 139 U. S. 1, 11 Sup. Ct. 389; and *Salt Co.* v. *Tarpey*, 142 U. S. 241, 12 Supt. Ct. 158, the court say :

" In both of these cases the writer of this opinion had the honor to write the opinions of this court, and it was never asserted or pretended that they decided anything respecting the minerals, but only that the title to the lands granted took effect, within certain designated exceptions, as the date of the grant. They never decided anything else; and what was that title? It was of the lands which at the time of the location had not been sold, reserved, or to which a pre-emption or homestead right had not attached. * * * It seems to us as plain as language can make it that the intention of Congress

was to exclude from the grant actual mineral lands, whether known or unknown, and not merely such as were at the time known to be mineral. * * * Mineral lands were not conveyed, but by the grant of Congress itself, and the subsequent resolution of Congress cited they were specially reserved to the United States, and excepted from the operations of the grant. Therefore they were not to be located at all, and, if in fact located, they could not pass under the grant. * * * When the act was passed it would have been impossible to state with any accuracy what parts of the tract contained minerals, and what did not. That fact could only be ascertained after extensive and careful explorations. * * * The determination of the character of the land granted by Congress in any case, whether agricultural or mineral, is placed in the hands of the officers of the land department, whose action is subject to the revision of the commission-ers of the general land office, and an appeal lies from them to the secretary of the interior. Under their direc-tion and supervision the actual character of the land may be determined and fully established." The court then quotes from the opinion of Mr. Noble, late secretary of the interior, in the case of *Railroad Co.* v. *Valentine,* 11 Land Dec. Dep. Int. 238. The language is as follows: "Moreover, I am informed by the officers in charge of the mineral division of the land department that ever since the year 1867 * * * it has been the uniform practice to allow and maintain mineral locations within the geographical limits of railroad grants, based upon discoveries made at any time before patent, or certifica-tion, where patent is not required."

It seems very clear from these decisions that while the grant to the Union Pacific Company was one *in præsenti,* and, as to the lands embraced within its limits which were not within the exceptions or reservations, the title took

effect, upon identification, as of the date of the grant, but as to lands containing minerals, whether known or unknown, no title passed, and the failure of the government to explore, or issue patents, and the great lapse of time, have not ripened a defective title into an indefeasible one. This being true, until patent issues there would be uncertainty as to the character of one's title. The land might be used exclusively for agricultural purposes; the grantee and its vendees might regard it as utterly devoid of mineral, men of science might unanimously agree that it was barren of mineral wealth; still, it is possible mysterious nature may have .impregnated the soil with its richest wealth. While the patent does not change the character of the land, it is more than an assurance of title. It is conclusive evidence, where no fraud exists, that the government regards the land as freed from the reservation, and it is a remission of any claim the government may possess by reason of mineral deposits upon the land. There can be no doubt but that this view attaches an: element of uncertainty to the land granted, as well as the holdings carved out of it. Mr. Justice Brewer, in his dissenting opinion, says: "Take any particular mile of the road, on either side of the line, as located, there are twenty alternate sections within the place limits. By the rule now laid down [speaking of the majority opinion of the court] the title to no one of these twenty sections passes to the company, because it is not known absolutely which are mineral lands. So far as known, none may be mineral, and yet, as in this case before us, six years after that line of definite location and exploration develops the fact of minerals, and then it is declared that the title did not pass. When you simply say, as the court does in this opinion, that out of those twenty sections there shall pass the title to such lands as shall thereafter be found or be determined by the secretary of the interior to be nonmineral

lands, you say, in effect, that there is no identification of a single tract."

It is claimed by counsel for appellants that the supreme court of the territory, in the case of *Tarpey* v. *Salt Co.*, 5 Utah, 494, 17 Pac. 631, decided that all lands, whether surveyed and selected, or not, within the grant limits, passed to the grantee, and clothed it with a perfect legal title. An examination of that case does not fully sustain counsel's statement. The court regarded the grant as conferring a perfect legal title *in præsenti,* as distinguished from an equitable or inchoate interest arising upon a contract or promise of the government. But this declaration is somewhat modified by the expression which is the important announcement in the opinion. It is this: "We think it is now beyond controversy that, where the question is presented as it is here,—where no right of the government, reserved in the act making the grant, is involved,—it grants the legal title *in præsenti* to all the lands included in the grant, whether surveyed or selected or not." A right of the government is involved in the reservation found in the act of July 1, 1862. The minerals were reserved to the sovereign. We agree with this view, that, aside from the reservations in the grant, a legal title passed to the grantee for all the lands covered by the grant. If the Union Pacific obtained a title less than fee simple by this grant,—and we think it did,—the exact character of it is not now in question. We will observe, however, that under the authority of *Tarpey* v. *Salt Co., supra,* the delay in issuing the patent, or omission of the government to explore and decide as to the mineral character of lands, would not prevent the grantee from occupying and holding the lands, and maintaining possessory actions against trespassers. A fee-simple estate is the largest in land known to the law. It is an abso-

32

lute estate in perpetuity, and excludes any qualification, restriction, or limitation.    From the foregoing it is apparent that, if the lands in controversy in this case are devoid of minerals, then the grantee possesses a perfect legal title.  If they contain minerals, aside from coal and iron, the railroad company has no title whatever.  Yet, as stated above, the Barden case leads to the position that, if there be undiscovered mineral when patent issues, the presumption becomes conclusive that it is barren of mineral wealth.  The failure to discover minerals, and the conclusiveness of this presumption, confer an indefeasible title, though in fact deposits of mineral wealth may abound in greater quantities than in the famous El Dorado. The railroad's title, then, to this land, is subject to be defeated.  At most, its title is a base or determinable fee. It may continue forever, or it may be determined at any moment, prior to the issuance of patent, upon the discovery of mineral.  And the case of *Ankeny* v. *Clark*, 148 U. S. 345, 13 Sup. Ct. 617, supports the view announced in the Barden case, viz., that until patent issues the title is imperfect in the grantee.

2. Respondents contend that, even if the title of the railroad company were free from imperfections, the various conveyances executed by it and its trustees and grantees did not pass a fee-simple title to plaintiffs.  We think the evidence clearly establishes the truth of this contention. It is not necessary to examine all the defects in the chain of title between the railroad company and the plaintiffs, but we will content ourselves with a single reference.    In the deed from the railroad company to plaintiffs the following reservation appears:    "Reserving, however, to the said Union Pacific Railway Company the right to prospect for coal and other minerals within and underlying said lands, and to mine and remove the same, if found; and

for this purpose it shall have the right of way over and across said lands, and space necessary for the conduct of said business thereon, without charge or liability for damage therefor." This is an incumbrance—an easement—upon the land. The grantee's title did not protect it from invasions and trespasses as oft-repeated as the grantor desired. While the fee passed to the grantee, assuming that it was held by the grantor, it was a servient estate. The mere statement of the reservation suffices to show the incompleteness of the estate conveyed to plaintiffs. But counsel insist that the deed executed by the railroad company on the 2d of November, 1891, cured this defect. The findings show that after the defendants had claimed a rescission of the contract, because no fee-simple title passed to them, the railroad company executed a quitclaim deed to plaintiffs, wherein it released "all right, claim, * * * it may have in or to any coal which may thereafter be found upon or beneath the surface of said land. * * * It being the intention of this deed to relinquish any rights which the said Union Pacific Railway Company may have retained in said land by virtue of the coal reservation * * * included in said deed of October 18, 1889." It will be observed that the company not only reserved the right to enter upon the lands and prospect and mine for coal, but "other minerals within and underlying said lands." The quitclaim deed only relinquished the right to prospect and mine for coal. It is clear that, even if the release had been in time,—that is, prior to defendants' notice of rescission,—it is insufficient. It releases less than was reserved.

3. The finding of the referee upon this question was that the plaintiffs informed defendants that they owned, and had a good title in fee simple to, 440 acres of land lying west of Ogden city, which said land so referred to was the land intended to be conveyed to defendants, and that the de-

fendants had not seen said land, and were not acquainted
with the title, but that plaintiffs promised that they would
furnish defendants with an abstract of title to said land;
that defendants believed, relied and acted upon, the repre-
sentations of plaintiffs, and, without investigating the title,
purchased an undivided two-thirds interest therein, which
purchase defendants would not have made if they had not
believed said representations; that said representations were
untrue.   The conclusion of law based upon this finding is
that the representations made to defendants concerning the
title were untrue, and a fraud, in law, upon the defend-
ants.   Appellants contend that this finding and conclusion
show that there was no "moral" fraud; that there was
simply innocent misrepresentation as to title; and that
where there is a partial failure of title, or a defect therein,
coupled with innocent misrepresentation as to such title, a
court of equity will not rescind, where the contract has
been executed.   The learned counsel for plaintiffs insist
that the findings and conclusions of law show that the
plaintiffs are entirely exonerated from moral turpitude, or
anything that indicates *mala fides*.   It is true, there is no
direct finding of a scienter in the misrepresentations, but
it seems equally clear that plaintiffs are not wholly excul-
pated from wrong in the transaction.   Plaintiffs knew that
defendants had never seen the land, and that they were
unacquainted with the title.   They knew that the purchase
was being made entirely upon their representations respect-
ing the title and its indefeasibility.   The conclusion of the
referee is not equivalent to a declaration that plaintiffs
were innocent in their affirmations of the unimpeachable
character of their title.   But, conceding the construction
placed upon the findings and conclusion of law above re-
ferred to is the correct one, the question presents itself
whether, under the facts, there is ground for equitable
relief in behalf of defendants.   Counsel for appellants

assume that the facts in this case show an executed contract, and learnedly argue that equity will not decree rescission of an executed contract, in the absence of moral fraud, and that where the contract is a warranty deed, and it is executed by the necessary parties, the purchaser has no remedy, either in law or in equity, in respect of defects in the title, or quantity or quality of the estate, which are not covered by the vendor's covenants. If the facts of this case show an executory contract only, it is not necessary to the determination of this case that we decide whether there is "legal," as distinguished from "moral," fraud, or what remedies are afforded the purchaser in executed contracts, where there is fraud or breach of covenants, because it is conceded, when the contract is still executory, the power of equity to decree rescission is ample. Is the transaction between the parties to this suit an executed or executory contract? "A contract is executory when the thing agreed has not been done. It is executed when the thing has been done. * * * One who has begun to do what he promised, but has not finished, has executed his undertaking in part." Bish. Cont. § 624.

Conceding that plaintiffs had a fee-simple title to the land intended to be conveyed, the deed contained a description of wholly different land. The land which defendants agreed to purchase was not conveyed. They contracted for a warranty deed to a certain tract of land. The contract was not fully performed by plaintiffs. It was executory. The writing or deed amounted to only a contract to convey the land which plaintiffs claimed to own, and in equity would be enforceable, and if the evidence was sufficient, would warrant a decree of specific performance. It was a contract executory, conveying a chose in action, not a contract executed, conveying a chose in possession. 2 Bl. Comm. p. 443; *McDonald* v. *Hewett*; 15 Johns. 349. No right *in rem* was created. The only rights existing

were *in personam.* If the contract between the parties had been executed, they would no longer have been bound by a contractual tie. Rights would have been acquired in property which would have extinguished the contract, but we find plaintiffs asking for a reformation of the contract showing that it was incomplete. Executory, the rights were *in personam.* They were seeking to enforce a chose in action. "An executory contract is one in which a party binds himself to do, or not to do, a particular thing." *Fletcher* v. *Peck,* 6 Cranch, 137. Plaintiff's warranty deed was a contract, in which they bound themselves to convey the land. Defendants agreed to purchase. But parol evidence would be required to establish the correct description. It was a defective deed, containing land which neither of the parties understood was conveyed or agreed to be conveyed. It was therefore only a contract to convey, and was executory. A defective deed is an executory contract, and "it is a familiar rule that a defective deed may be treated in equity as as agreement to convey, and performance enforced; and, where it is, we think * * * that it stands on the same footing as an executory contract to convey." *Hanson* v. *Michelson,* 19 Wis. 535; *Petesch* v. *Hamsbach,* 48 Wis. 447, 4 N. W. 565; *Eaton* v. *Eaton,* 15 Wis. 284; *Mastin* v. *Halley,* 61 Mo. 200; *Fitch* v. *Gosser,* 54 Mo. 274.

In the case of *Hunt* v. *Rousmanier's Adm'rs,* 1 Pet. 13, the court say: "There are certain principles of equity applicable to this question which, as general principles, we hold to be incontrovertible. The first is that where an instrument is drawn and executed which professes or is intended to carry into execution an agreement, in writing or by parol, previously entered into, but which, by mistake of the draftsman, either as to equity or law, does not fulfill, or violates, the manifest intention of the parties to the agreement, equity will correct the mistake, so as to produce a conformity of the instrument to the agreement,

The reason is obvious. The execution of agreements fairly and legally entered into is one of the peculiar branches of equity jurisprudence; and if the instrument which intended to execute the agreement be, for any cause, insufficient for that purpose, the agreement remains as much unexecuted as if one of the parties had refused altogether to comply with his engagement." And in the case of *Walden* v. *Skinner,* 101 U. S. 585, this language is adopted and the principle reaffirmed. In the case of *Conrad* v. *Schwamb* (Wis.), 10 N. W. 396, plaintiffs brought an action to recover a tract of land. A deed had been executed to defendant. The grantors intended to convey certain land in fee, but, by mistake, it was described as being in a different quarter section. The court say: "The deed, * * * although it did not convey the land intended, must be treated, in equity, as an executory contract * * * to convey such land. * * * Hence * * * Schwamb might have maintained an action against Felton * * * to compel Felton specifically to perform his executory contract to convey the land claimed, so far as he could perform it." And the quitclaim deed, correctly describing the land, tendered to defendants after the discovery of the mistake in the first deed, did not answer the contract and fully execute it. Besides, the defendants had, a few days prior thereto, elected to rescind the contract, and had demanded back the amount paid, and the surrender of the notes held by plaintiffs.

From the foregoing authorities, we are of the opinion that the facts in this case do not constitute an executed contract. The transaction between the parties, we think, evidences an executory contract, and that equity has power to decree a rescission. We are not determining what *mala praxis* is sufficient to entitle one to rescind an executed contract; for, as stated, the transaction in this case shows an executory contract, and we believe the rule to be well

settled that material representations which are untrue,
though innocently made, or the concealment of material
facts by mistake or inadvertence, when relied on and which
have become the foundation of the active relations between
the parties, operate as a "surprise and imposition," and
constitute such fraud as will move a court of equity to
decree a recission of an executory contract. 1 Story. Eq.
§ 193; 1 Beach. Eq. Jur. §§ 69, 93; Bish. Con. § 662;
Clark, Cont. p. 339; 2 Pom. Eq. Jur. §§ 883, 887, 889;
*Derry* v. *Peek*, 14 App. Cas. 337; *Arkwright* v. *Newbold*,
17 Ch. Div. 320; *Traill* v. *Baring*, 4 De Gex, J. & S.
318; *Ship* v. *Crosskill*, L. R. 10 Eq. 73; Cooley, Torts
(2d ed.) p. 582; *Hexten* v. *Bast*, 125 Pa. St. 52, 17 Atl.
252; *Furnace Co.* v. *Moffatt*, 147 Mass. 403, 18 N. E. 168;
*Wells* v. *McGeoch*, 71 Wis. 196, 35 N. W. 769; *De Frees*
v. *Carr* (Utah), 33 Pac. 217; *Cotzhausen* v. *Simon*, 47
Wis. 106, 1 N. W. 473; *Grant* v. *Law*, 29 Wis. 99; *Knowl-
ton* v. *Amy*, 47 Mich. 204, 10 N. W. 201; *Bullitt* v. *Farrar*
(Minn.) 6 L. R. A. 149, 43 N. W. 566; *Litchfield* v.
*Hutchinson*, 117 Mass. 195; *Smith* v. *Richards*, 13 Pet.
26; 2 Warv. Vend. § 18. "As a rule, all representations
which are untrue, and which materially affect the value
of the property which forms the subject of the contract,
will furnish grounds for a rescission, even though they
may have been made without fraudulent intent." 2 Warv.
Vend. § 18; *Allen* v. *Hart*, 72 Ill. 104; *Bennett* v. *Jud-
son*, 21 N. Y. 238; *Mulvey* v. *King*, 39 Ohio St. 491;
*Wilcox* v. *University*, 32 Iowa 369; *Alvarez* v. *Brannan*,
7 Cal. 503. The facts in this case show that the repre-
sentations of plaintiffs as to the character of their title to
the land were more than mere expressions of opinion.
They were affirmations of a material fact, and induce-
ments to the contract. Being untrue and material, they
are fraudulent. *Cressler* v. *Rees*, 27 Neb. 515, 43 N. W.
363; *Conlan* v. *Roemer* 52 N. J. Law, 53, 18 Atl. 858.

4. There is no controversy in regard to the materiality of the representations made respecting the title, nor is it contended that defendants did not act in due season in giving notice of the rescission after the discovery of the defect in the title; but plaintiffs urge that, the defendants not having tendered back a deed of the property conveyed, there was no rescission. The rule is, no doubt, that the parties must be placed in *statu quo* before a rescission can be effectuated. Having decided that the warranty deed executed by the plaintiffs was merely an executory contract, it follows that defendants had nothing to return to plaintiffs in order to place them in *statu quo*. The referee found that the land described in the warranty deed was not owned by plaintiffs, and the conveyance executed by them certainly created no cloud upon the owner's title, if there was an owner. Plaintiffs conveyed nothing to defendants. Their deed was worthless, except that it might be the basis of an action in equity for specific performance, or the foundation of a suit at law, after reformation, for a breach of the vendor's covenants. Plaintiffs having parted with nothing of value, defendants had nothing to return, and in such case the failure to tender that which was valueless cannot be interposed to prevent a rescission of the contract. Bish. Cont. § 679. The referee finds that the defendants never actually occupied any of the land sought to be conveyed, but that plaintiffs were in possession of the same. We think that the record clearly discloses that the defendants did all that was required by law, upon their part, in order to justify a decree of rescission by the court. We find no error in the record, and therefore affirm the judgment of the lower court, with costs.

MERRITT, C. J., concurs.    BARTCH, J., concurs in the result.